WICKER, Judge.
Pipe Liners, Inc., the plaintiff, appeals a preliminary injunction in favor of U-Liners East, Inc., one of the many defendants in this suit: Edenwald Contracting Co., Inc.; U-Liners East, Inc.; U-Liners Inc.; U-Liners Contracting Co.; and several of the individual owners of these corporations: Charles J. Follini, Jr.; Robert Follini; Charles Follini, Sr.; Eugene J. Camali; and George Paletta. The suit concerns the interpretation of a licensing agreement among the various parties. We affirm and remand for further proceedings.
Pipe Liners developed, patented, and sells a process and materials for repairing underground pipes without digging up the ground. It uses plastic liners deformed into a “U” shape, which are threaded through existing pipe and then expanded with steam pressure. It granted exclusive licenses for the use of its process and products. It entered into such an agreement with Edenwald on August 2,1988, covering New York, New Jersey, and Connecticut. Edenwald assigned its rights under the licensing agreement to U-Liners. Pipe Liners also contracted with U-Liners East, a corporation with apparently the same principals as Edenwald and U-Liners, on August 25, 1988, for exclusive rights in Area 1 (Maine, Vermont, New Hampshire, Massachusetts, and Rhode Island) and Area 2 (Delaware, Virginia, Maryland, the District of Columbia, and most of Pennsylvania).
The August 2nd agreement has apparently been successfully and profitably performed by the parties. It is not an issue in this proceeding, except as evidence of its own success. The August 25th agreement is the subject of this lawsuit. Alleging U-Liners East's failure to perform its obligation to purchase a stipulated minimum amount of pipe, Pipe Liners sued all corporate and individual defendants for a declaratory judgment that the licensing agreement was binding and enforceable. Pipe Liners then, however, notified U-Liners East that it intended to cancel U-Liners East’s exclusive rights in Areas 1 and 2 pending the declaratory judgment ruling. U-Liners East responded with a petition for temporary restraining order, preliminary, and permanent injunctions maintaining the status quo pending the outcome of the declaratory judgment suit.
The judge concluded that cancellation of U-Liners East’s exclusive rights would irreparably injure its goodwill and reputation and that of its principals. She ruled that *1111 these injuries were impossible to compensate with money. She also noted that she was impressed with Mr. Camali’s sincerity and his explanation of the problems experienced, finding U-Liners East to be “in full compliance” with the agreement under the circumstances.
[T]o deny U-Liners East, one of PLI’s first and finest licensees in a world wide operation, the opportunity after three and one half years to receive its exclusive rights in these areas would be a travesty of justice and would defy any reasonable interpretation of the aforesaid provision of the August 25, 1988 agreement.
Pipe Liners argues that U-Liners East failed to meet the requirements for injunc-tive relief: irreparable injury, inadequacy of monetary damages, and likelihood of success on the merits. U-Liners East argues that the judge was not clearly wrong; that it did, in fact, “fulfill” the requirements of the licensing agreement; and that it need not prove irreparable injury to obtain injunctive relief.
The licensing agreement which is the subject of this lawsuit contains the following provisions:
PLI [Pipe Liners] hereby warrants that all U-Liner pipe will be produced according to specifications requested by Licensee with respect to internal diameter and wall thickness (emphasis added).
[[Image here]]
This Agreement provides for payment of royalties by Licensee to PLI in conjunction with the installation of deformed (U-Liner) pipe by Licensee, any of its subli-censes [sic] or subcontractors, in accordance with the following schedule:
Diameters: 0" to 5.99" - $4.00 per foot
6.0" to 11.99" - $5.00 per foot
12.0" to 23.99" - $6.00 per foot
24.0" and up - $7.00 per foot
U-Liners East contends that these two paragraphs, taken together, constitute a warranty by Pipe Liners that pipes in all these listed sizes are available.
The licensing agreement also provides that PLI can cancel the exclusivity feature if U-Liners East’s sales do not equal a certain number of pipe-feet a year. It is this provision upon which Pipe Liners relies as authority to cancel the exclusivity provisions of the agreement.
The parties agreed to agree on certain changes in the licensing agreement on April 3, 1989, to outline responsibility for research and development. The final supplemental agreement was signed in August of 1989, one year after the original licensing agreement. It has additional relevant provisions:
1. LICENSOR acknowledges that LICENSOR is responsible to the LICENSEE to provide a product of merchantable quality according to PLI specifications and/or applicable industry standards as they pertain to length, outside diameter and SDR....
[[Image here]]
3. The installation royalty payment due to LICENSOR by LICENSEE is here amended to read as follows:
Pipe Diameter Amount of Royalty
0.00" to 5.99" $4.00 per linear foot
6.00" to 11.99" $5.00 per linear foot
12.00" to 17.99" $6.00 per linear foot
18.00" to 24.00" $7.00 per linear foot
[[Image here]]
9. In consideration for LICENSOR reducing the manufacturing royalty as described in paragraph # 5 of this Agreement, LICENSEE shall fund the development, design, manufacture and purchase of certain equipment necessary to manufacture 2" to 24" diameter deformed pipe liner....
[[Image here]]
12. LICENSEE agrees to pay $50,000 to LICENSOR for ongoing and in process research and development in connection with the installation of deformed liner....
Eugene Camali, president of U-Liners East, testified on its behalf, stating that he and his partner had twenty and fifty years’ experience respectively in contracting. U-Liners East met with Pipe Liners for the first time in 1988, leading to the August licensing agreements. According to Mr. Camali, the licensing agreement warrants that Pipe Liners will make pipe according to U-Liners East’s specifications. Since *1112 Pipe Liners had said it would take about six months to have all the pipe available, he anticipated starting work under the licensing agreement about April of 1989.
About $1,500,000.00 has already been paid under the agreement. Mr. Camali testified that U-Liners East has complied with the agreement: it marketed the territory, hired salesmen with an engineering background, installed pipe, purchased installation equipment, and paid the quarterly minimum to Pipe Liners for three years. U-Liners East was the successful low bidder on a contract which it then had to give up because it couldn’t get the product from Pipe Liners. He also testified that Pipe Liners delivers pipe late, sometimes the pipe is defective, and sometimes sizes are not available. So, he concluded, “we have not been able to attack the marketplace as we had geared up to.” U-Liners East’s first project went $750,000.00 over bid and more than one year past the projected completion date “because we never received the technical support necessary, we never had the proper cutting means necessary, and it was — basically it was a learning curve for everybody.”
Mr. Camali stated that Pipe Liners was constantly asking for more money. There were problems with damaged pipe where U-Liners East had to dig up the street at its own expense and do the repair the old-fashioned way or pull out the damaged liner and put in new liner. While this was going on, Pipe Liners sent U-Liners East a letter in November 1990 revoking the exclusivity clause in the licensing agreement. However, Pipe Liners was unable to supply pipe larger than ten-inch with any consistency, and the twelve-inch was available but faulty. U-Liners East responded to Pipe Liners’ revocation letter by sending a list of jobs it had lost because of pipe unavailability, leading Pipe Liners to retract its revocation letter and promise that the full range of pipe up to twenty-four inches would be available by January or February 1991. In his opinion, Pipe Liners has received more than it expected monetarily while U-Liners East “has only gotten aggravation.”
It’s tough to even think about it. It’s— we have worked nearly four years, waiting for a product that we thought we had four years ago, and we have suffered and endured with these people for the last four years. We have given them millions of dollars to help them develop this process that they sold us in ’88, telling us that they already had. We have marketed the territories, we have spent I don’t know how many millions of dollars on equipment sitting in our yard, most of the time waiting to go out and perform work when we haven’t been able to get a product. We have — we’ve had our reputations, in some areas, just laughed at because of the fact that we’ve secured contracts that we couldn’t get product on. It’s very difficult to have bought something where you think you have exclusive rights to, you wait four years for somebody to deliver something that they claimed they’ve had from four years ago, and then they want to turn around and next thing you know, you’re competing against yourself.
[[Image here]]
Over the last four years, we have helped them tremendously in making this process something that it was supposed to have been four years ago. We’re finally on the threshold of getting to the point where we should have been four years ago and have endured it and have not— have not been able to reap the benefit of these exclusive rights that we have paid for over the last four years.
[[Image here]]
I mean, it’s — I don’t know how you could put a dollar figure on what we’ve done, and not only what we’ve done in our territory, but what we’ve done for these people throughout the world. I don’t see how we can — I don’t know how you could turn back the time, four years ago, when we paid for something four years ago and we still haven't got it; and now, when we’re very close to it, we’re finally very close to it, and now, all of a sudden, they want to take it away.
Mr. Camali admitted that the licensing agreement gives Pipe Liners the right to terminate its exclusivity if certain mini *1113 mum amounts of pipe are not installed. He also admitted that he had not complied with these minimum requirements in any year. Pipe Liners testified through its general counsel and corporate secretary, Charles T. Curtis, who handles administrative and legal matters for it. Pipe Liners started in 1987 and has twelve U.S., eight European, one Australian, and one Canadian joint venture licensees. Mr. Camali approached Pipe Liners about obtaining a license. Pipe Liners prepared the contract between the parties, but it was heavily negotiated by both sides. Of approximately twenty licensees, U-Liners East is the only one Pipe Liners has any significant legal problems with.
According to Mr. Curtis, everyone concerned knew that larger pipe wasn’t available. The royalty payments were scheduled to coincide with upcoming availability of larger pipe as incentives to Pipe Liners to get the pipe out. Mr. Curtis believed that U-Liners East’s interpretation of the agreement is ridiculous because, “given the state of the equipment and machinery, which [Mr. Camali] was well aware of at the time, it was absolutely, totally impossible.” Also, U-Liners East inspected Pipe Liners’ plant before signing; and it would have been obvious that Pipe Liners was manufacturing only eight and ten-inch pipe at that time. There was no ambiguity in the “warranty” paragraph at issue in the beginning, because U-Liners East knew what size pipe was available. Now U~ Liners East is trying to bootstrap this into a promise to provide twenty-four inch coils.
Mr. Curtis testified that U-Liners East had failed to live up to the agreement, as it has never employed the minimum amount of pipe required except in the New York area [subject of a different agreement]. He and Mr. Curtis had numerous talks about U-Liners East’s lack of development: it had no salesmen, no offices, and was not marketing the product. It never provided a business plan showing how it intended to market the product. In fact, U-Liners East didn’t put salesmen or offices in area 1 and 2 until the last several months. Consequently, Pipe Liners rescinded its exclusivity. Pipe Liners later cancelled its recission letter because it didn’t want to get in a lawsuit and U-Liners East agreed to do marketing and fulfill the minimum requirements. These were the conditions of cancellation.
According to Mr. Curtis, Pipe Liners was able to make eight and ten-inch pipe at the inception of the agreement; but it believed and still believes that it can make pipe of up to twenty-four inches diameter. “All of our other licensees bid on numerous jobs that they get and they put hundreds of thousands of feet of pipe in the ground and on almost all of the jobs, it’s eight, ten and twelve-inch pipe.” He said everybody in the industry knows how difficult, if not impossible, it was to coil eighteen and twenty-four-inch pipe.
Mr. Curtis further testified to a history of financial dealings and conflicts arising out of this license. In fact, U-Liners East sued Pipe Liners in New York; but the suit was dismissed for lack of venue.
Mr. Curtis said that if Pipe Liners can get other licensees in areas 1 and 2, “it will stimulate the market for pipe and ... everyone will come out ahead.” Pipe Liners stands to lose $500,000.00 if it cannot get another licensee.
The evidence, especially the agreement between the parties, indicates that both parties contemplated the availability of pipe up to and including twenty-four inches but that, as late as a year later, Pipe Liners, with funding provided in part by U-Liners East, was still trying to develop the large-size pipe. The agreement also indicates that U-Liners East undertook a large part of the responsibility for making the process work by developing suitable tools for installation, subject to a reimbursement by Pipe Liners of expenses up to $150,000.00.
The law provides for the mandatory issuance of an injunction “in cases where irreparable injury, loss, or damage may otherwise result to the applicant_” La. C.Civ.P. art. 3601. That article also provides for the ancillary right to a preliminary injunction at the judge’s discretion pending the litigation. See Smith v. West Virginia Oil & Gas Co., 373 So.2d 488 *1114 (La.1979); Schwegmann Bros. G.S. Mkts. v. Louisiana Milk Com’n, 290 So.2d 312 (La.1974). The seeker of a preliminary injunction must make a showing that his damage or loss will be irreparable and make a prima facie showing that he will prevail on the merits. Franz v. Cormier, 579 So.2d 1201 (La.App. 5th Cir.1991); Smith v. Lee, 444 So.2d 696 (La.App. 5th Cir.1984). “[T]he principal demand is determined on its merits only after a full trial under ordinary process, even though the hearing on the summary proceedings to obtain the preliminary injunction may touch upon or tentatively decide merit issues.” Smith v. West Virginia Oil & Gas Co. at 494.
These legal principles must be applied to facts, and the judge’s factual conclusions must be accepted unless they are clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989).
The two witnesses testified to different interpretations of the “warranty” paragraph; and it is not manifestly erroneous for the judge to have found Mr. Cama-li’s interpretation more credible than that of Mr. Curtis, as she must have done in order to find U-Liners East’s clear breach of the minimum installation requirement excused by Pipe Liner’s failure to provide the large-size pipe. Thus, she made a determination that U-Liners East had made a prima facie showing that it could prevail on the merits. We decline to set aside the judge’s implicit ruling that U-Liners East’s apparent breach of its agreement was justifiable due to impossibility to perform. La. C.C. art. 1772; Unis v. JTS Constructors/Managers, Inc., 541 So.2d 278 (La. App. 3rd Cir.1989).
“Irreparable injury means the moving party cannot be adequately compensated in money damages for his injury or suffers injuries which cannot be measured by pecuniary standards_” Franz v. Cormier at 1203. U-Liners East, and its president Mr. Camali, have testified to non-pecuniary damages, such as loss of reputation, which may well be insusceptible of being reduced to a dollar amount. The proof in such cases is very difficult, since such damages may be deemed to be conjectural or speculative. See E.B. Ludwig Steel v. C.J. Waddell, 534 So.2d 1364 (La.App. 5th Cir.1988), writ denied 536 So.2d 1239 (La.1989).
We do not believe the judge has abused her discretion in granting U-Liners East, Inc. a preliminary injunction and hereby affirm. We remand the matter for further proceedings.
AFFIRMED AND REMANDED FOR FURTHER PROCEEDINGS.