693 So.2d 835 (1997)
HCNO SERVICES, INC. and Palm Tree Management Co., Inc.
v.
SECURE COMPUTING SYSTEMS, INC., Colorado Property Investors, Inc. and Leo James Radosta.
Nos. 96-CA-1753, 96-C-1693.
Court of Appeal of Louisiana, Fourth Circuit.
April 23, 1997.
*837 Lawrence D. Wiedemann, Karl Wiedemann, Wiedemann & Wiedemann, New Orleans, for Plaintiffs/Appellants/Respondents.
C. Emmett Pugh, Rickey R. Hudson, National Law Offices of Pugh/Associates, Patent and Trademark Attorneys, New Orleans, for Defendants/Appellees/Relators.
*838 Before LOBRANO, PLOTKIN and WALTZER, JJ.
LOBRANO, Judge.
The issues in this consolidated writ and appeal are whether the trial judge was clearly wrong in dissolving a previously issued preliminary injunction, awarding damages for its wrongful issuance and holding defendants-appellees in contempt for violating the injunction.[1] The injunction at issue was obtained on March 16, 1995 and was dissolved on January 22, 1996. The contempt order was issued on February 7, 1996 and the damage award was rendered March 27, 1996. The facts and procedural history precipitating these judgments are as follows:
Colorado Property Investors, Inc. (CPI) was incorporated in 1980. Secure Computing Systems, Inc. (SCS) was incorporated in 1989. Leo James Radosta, a computer software developer, is the president and principal owner of both CPI and SCS. Sometime in late 1989, Radosta became acquainted with Hospice of Greater New Orleans (Hospice), and its chief executive officer, Jo Ann Mueller. Hospice is a non-profit corporation, unrelated to HCNO Services (HCNO). HCNO operates a staffing agency that trains and leases certified nursing assistants to Hospice and produces training videos for sale.
Hospice engaged Radosta to design a software program to fit its billing and administrative needs. Using Hospice as the initial "alpha" site, Radosta wrote a new program called "OASIS". The OASIS program was offered to the hospice industry in 1990 and eventually was copyrighted by Radosta in 1991. SCS was awarded the exclusive marketing rights to OASIS by CPI. SCS created a product logo, product literature, information packets, display booths and marketing plan. All sales were handled by SCS. By the end of 1993, SCS's total sales, including OASIS, reached $700,000.00. Nevertheless, Radosta needed an infusion of cash into the OASIS business and he began to look for an investor.
HCNO is owned by Jo Ann Mueller's children, Mark Mueller, Michael Mueller, Melissa Mueller and Melinda Mueller. The Mueller siblings met Radosta through their mother. By February, 1994, Mark Mueller was hired by SCS to sell the OASIS program. He accompanied Radosta to various sales demonstrations to learn the various sales techniques used by Radosta.
The parties agree that the Muellers did invest money in SCS and/or CPI through HCNO. However, the parties disagree as to the amount invested. Nevertheless, the Muellers and Radosta entered into some kind of business arrangement while negotiating towards a written agreement which supposedly would eventually give the Muellers a 50% ownership interest in SCS. In exchange for their ownership interest, the Muellers would infuse cash in SCS allowing it to expand its software business. Mark Mueller would manage the sales portion of the business in exchange for a commission override; Radosta would continue as president; and, Radosta and the SCS staff would continue to handle the technical support services. Negotiations continued without success.
On September 7, 1994, Radosta and Jo Ann Mueller met for lunch to discuss the Muellers' latest proposal which had been faxed to Radosta by Mark Mueller on September 5, 1994. From this point on the parties' rendition of what followed differs dramatically.[2] We first present Radosta's version.
Radosta asserts that there was no meeting of the minds during the luncheon meeting as to a written agreement. Radosta claims that he roundly rejected the Mueller proposal for a number of reasons which he noted on the proposal. Among Radosta's most serious objections were the Muellers' proposals to place the OASIS source code in an escrow account *839 and to form a new company to be referred to as "Secure Management Company" (SMC), the ownership of which was to be split 50-50 between SCS and HCNO. SMC was to be the management company for the OASIS business.[3]
Radosta claims that all he agreed to and signed at the luncheon meeting with Jo Ann Mueller was a "document of simple intent" which listed common goals between the parties. This document consisted of two pages with the second page being the signature page. Radosta was not given a copy of this document. On September 8, 1994, the following day, Radosta asserts that he sent a two page fax to Jo Ann Mueller containing his suggestions for the proposed agreement. Negotiations continued without success.
On December 13, 1994, Radosta claims he met with Mark Mueller in a continuing effort to reach an agreement. It was at this meeting that Radosta claims that he first saw his signature on the signature page from the "document of simple intent" attached to the previously rejected Mueller proposal. Knowing the agreement was an absolute fake, Radosta claims he dismissed "it out of hand". No agreement was reached.
Following this meeting, Radosta states that Mark Mueller placed an unauthorized address change with the post office so that all SCS mail would be sent to Muellers' Metairie office, that Mueller illegally deposited $25,000.00 in checks made payable to SCS into an HCNO account, and that Mueller had SCS's telephones disconnected. This is when Radosta decided to sever ties with the Muellers.
On December 29, 1994, the parties met and, according to Radosta, it was decided that he would attempt to raise $95,000.00 to buy-out the Muellers and compensate them for the money they invested in SCS. The parties would then go their separate ways. Subsequent to this meeting, for whatever reason, a last effort was made to salvage the relationship between the parties.
Radosta met with Ed Morgan of Peachtree Hospice who expressed an interest in investing in SCS. Morgan was to acquire 22% of SCS, the Muellers and Radosta would each have 39%. Mark Mueller would be in charge of sales only. Radosta would continue to handle the support and technical end of the business. Morgan would hire the Administration Manager. CPI was to receive guaranteed, minimum annual royalties of $87,500.00 based on minimum OASIS sales of $350,000.00 at a 25% royalty rate, paid monthly and adjusted quarterly to reflect actual sales. CPI would also conduct upgrades on a fee-for-service basis and Radosta would additionally receive 39% of the net profits. Radosta was in agreement. A meeting to formalize the agreement was to be held on February 17, 1995. However, the letter of intent drafted by Mark Mueller differed significantly from the discussed proposal, and that deal fell apart. Radosta claims he made two subsequent attempts to resolve the matter. The last offer tendered by Radosta was on or about March 7, 1995.
The Muellers version of the facts following the September 7, 1994 luncheon meeting differ dramatically from that of Radosta.
The Muellers claim that following the meeting between Radosta and Jo Ann Mueller, an agreement was finalized. After the meeting both parties returned to Jo Ann Mueller's office where the details of the agreement were put on a computer disk in order to make necessary changes. Mark Mueller approved the deletion of the provision placing the OASIS source code in escrow. Radosta then signed the agreement as president of CPI and SCS. Jo Ann Mueller signed as a witness. The agreement provided that HCNO would form a joint venture management company to be called Secure Management Company (SMC), owned equally by SCS and HCNO. SMC would manage the OASIS business. The name "Secure Management Company", however, was never used because it was unavailable. Instead *840 Palm Tree Management Company, Inc. (Palm Tree) was incorporated on November 29, 1994 as the new management company. In consideration for royalties to be paid to CPI, the agreement granted Palm Tree the exclusive right to sell all OASIS products, including the then current OASIS products, forms of OASIS produced by CPI and/or Radosta, new modules or features, and any product sold to any existing OASIS customer. The Muellers also claim the agreement required Palm Tree to provide customers with technical support, along with the cooperation of CPI whenever Palm Tree needed technical assistance. In exchange, CPI would receive 10% of the total amount collected in support income.
The Muellers claim that shortly after the agreement was finalized, Radosta actively began to thwart Palm Tree's efforts to manage the OASIS business by accepting the financial benefits (payments of SCS's operating expenses) via the agreement while refusing to transfer the management or assets to Palm Tree; by refusing to forward customer calls and correspondence to Palm Tree for technical support; by divesting payments from Palm Tree to SCS and CPI; and, by soliciting OASIS customers in violation of the exclusivity provision of the agreement.
On March 8, 1995, HCNO and Palm Tree filed a petition for a permanent injunction against SCS, CPI and Radosta alleging breach of contract, unfair trade practices, tortious interference with a contract, misrepresentation and detrimental reliance. HCNO and Palm Tree asserted that immediate, irreparable injury and loss would result to their interests in the OASIS business and requested a temporary restraining order (TRO) issue enjoining SCS, CPI and Radosta from continuing to manage the OASIS business. HCNO and Palm Tree requested preliminary and permanent injunctive relief. On that same date, a TRO was granted by the duty judge. One week later, on March 15, 1995, a different duty judge granted HCNO and Palm Tree a preliminary injunction enjoining SCS, CPI and Radosta from participating in the OASIS business.[4] Subsequently, SCS, CPI and Radosta filed a motion to amend the injunction and, in the alternative, to raise the injunction bond. On April 7, 1995, the same duty judge that issued the preliminary injunction ordered the bond raised from $5,000.00 to $50,000.00.
On July 11, 1995, HCNO and Palm Tree filed a motion for contempt against Radosta, SCS and CPI alleging various violations of the TRO and preliminary injunction. On September 20, 1995, Radosta, SCS and CPI filed a motion to dissolve the preliminary injunction alleging it had been wrongful issued.
The motions of the parties were subsequently heard over a four month period on October 27, 1995, October 30, 1995, November 3, 1995, January 12, 1996 and January 22, 1996. At the conclusion of the hearings, on January 25, 1996, the trial court issued an order dissolving the preliminary injunction finding that HCNO and Palm Tree failed to show either irreparable injury or a prima facie case that an agreement had been reached by the parties. On February 7, 1996, the trial court granted HCNO's and Palm Tree's motion for contempt and fined Radosta, SCS and CPI $10,000.00 "for the acts of contempt". Finally, on March 27, 1996, the trial court awarded damages to Radosta, SCS and CPI in the amount of $50,000.00 as a result of the wrongfully issued preliminary injunction.
HCNO and Palm Tree suspensively appeal the January 25, 1996 and March 27, 1996 judgments asserting two errors:
1) The trial court erred by dissolving the preliminary injunction based on a failure to show irreparable injury and,
2) The trial court erred by awarding damages to Radosta, SCS and CPI because no damages were sustained.
In their application for supervisory writs filed June 19, 1996 Radosta, CPI and SCS seek review of the February 7, 1996 judgment finding them in contempt and levying a *841 fine of $10,000.00 alleging the court erred in the following respects:
3) In applying the minimal "preponderance of evidence" standard of proof rather than the proper and more exacting "beyond a reasonable doubt" standard for criminal contempt.
4) In finding defendants in contempt of court for violating the TRO/injunction.
5) In arbitrarily levying an excessive fine in excess of the statutory limit.
6) In denying defendants their due process right to a full and fair hearing.
The first error assigned by HCNO and Palm Tree raises the issues of whether, at the time the preliminary injunction was issued, there was a prima facie showing of irreparable injury, and whether petitioners were likely to prevail on the merits and thus were entitled to injunctive relief. See, General Motors Acceptance Corp. v. Daniels, 377 So.2d 346 (La.1979). The second error raises the issue of sufficiency of proof of the damages. The writ application questions the correctness of the contempt order and the fine levied.
The denial or dissolution of a preliminary injunction should not be overturned on appeal absent a clear abuse of the great discretion afforded the trial court. Oestreicher v. Hackett, 94-2573 (La.App. 4th Cir. 5/16/95), 660 So.2d 29, 31, writ denied, 95-2592 (La.12/8/95), 664 So.2d 422, and cases cited therein. For the following reasons, we affirm the trial court judgment which is the subject matter of the appeal, grant the writ application and affirm the finding of contempt, but reduce the fine.

ASSIGNMENT OF ERROR 1:
HCNO and Palm Tree assert that they carried their burden of proving irreparable harm and thus the trial court erred in dissolving the previously issued injunction on those grounds.
First, they argue the preliminary injunction was proper and necessary to preserve the status quo by protecting the intangible aspects of the OASIS business which, they claim, are not subject to monetary damages. Those intangibles, they claim, are damage to business reputation, loss of business opportunities, and harm to competitive position. In support they cite Pipe Liners, Inc. v. Edenwald Contracting Co., 93-835 (La.App. 5th Cir. 1/18/95), 650 So.2d 304; Corrosion Specialties v. Dicharry, 93-196 (La.App. 5th Cir. 2/9/94), 631 So.2d 1389, writ denied, 94-0597 (La.3/25/94), 635 So.2d 242; and Pipe Liners, Inc. v. Edenwald Contracting Co., 610 So.2d 1109 (La.App. 5th Cir.1992). Second, they argue irreparable harm was present because of the insolvency of SCS, CPI and Radosta which, they claim, would render any future damage award valueless, citing Oestreicher v. Hackett, supra.
Countering these arguments, SCS, CPI and Radosta assert that HCNO and Palm Tree were not entitled, as a matter of law, to injunctive relief because the underlying action in their petition from which all alleged damages flow is an action for breach of contract which can be remedied exclusively by a monetary judgment and not via the extraordinary remedy of injunctive relief. They further assert that, at the time the injunction issued, no evidence of insolvency was presented and, in fact, that they were not insolvent and that any financial difficulty suffered came after the injunction was issued and was a direct result of its wrongful issuance.

ANALYSIS:
An injunction shall issue in cases where irreparable injury, loss, or damage may occur to the applicant. During the pendency of an action for injunction, the court may issue a temporary restraining order, preliminary injunction or both. La. C.C.Pro. art. 3601. A preliminary injunction is an interlocutory procedural device designed to preserve the existing status pending a trial of the issues on the merits of the case. (emphasis added) Federal Nat. Mortg. Ass'n v. O'Donnell, 446 So.2d 395, 398 (La.App. 5th Cir.1984).
To obtain a preliminary injunction, the applicant must show that the damage he will suffer may be irreparable if the injunction does not issue, that he is entitled to the relief sought, and must make a prima facie showing that he will prevail on the merits of the case. General Motors Acceptance Corporation *842 v. Daniels, supra; Burnham Broadcasting Company v. Williams, 629 So.2d 1335, 1338 (La.App. 4th Cir.1993), writ denied, 94-0150 (La.2/25/94), 632 So.2d 770, cert. denied, 513 U.S. 814, 115 S.Ct. 69, 130 L.Ed.2d 25 (1994).
Because injunction is a harsh, drastic and extraordinary remedy, it should issue only if the applicant is threatened with irreparable loss without adequate remedy at law. Oestreicher, supra 660 So.2d at 31. Irreparable injury means the applicant cannot be adequately compensated in money damages for his injury or suffers injuries which cannot be measured by pecuniary standards. Bagert v. Goldsmith, 504 So.2d 648, 651 (La.App. 4th Cir.1987), writ denied, 508 So.2d 74 (La.1987), 508 So.2d 76 (La. 1987). If, however, the judgment would be valueless because of insolvency of the judgment debtor or other reasons, injunctive relief may be proper. Ciambotti v. Decatur-St. Louis, Lupin, Properties Ventures, 533 So.2d 1352, 1358 (La.App. 3rd Cir.1988).
The threshold cause of action alleged in HCNO's and Palm Tree's petition is breach of contract.[5] The only relief sought is a permanent injunction. In support of their request for a preliminary injunction, HCNO and Palm Tree submitted the alleged contract, sworn affidavits of Jo Ann Mueller and Mark Mueller and Radosta's hand written notations on the contract proposal. The content of both affidavits is to the effect that a contract was agreed to and signed by Radosta in his capacity as president of SCS and CPI and that Radosta had breached the contract and that SCS, CPI and Radosta owed Palm Tree for expenses paid on behalf of CPI.
In response, Radosta, in pleadings and documentation, alleged the purported contract was bogus, the Mueller affidavits false and that SCS and CPI at all times owned, controlled and managed the OASIS business up until the filing of the lawsuit.
At the hearing on March 8, 1995, the duty judge immediately recognized the action as one in contract which could be remedied by a money judgment, and for that reason, seemed to display a reluctance to issue the injunction even though he eventually did so. His comments evidence that reluctance.
Let me tell you my problem. I am not trying to cut you short, it is just that I read it and I have got a reasonable idea of what it is. Bottom line looks to me like he [Radosta] is saying there is no contract because, whatever you have, the first two pages were changed and it is only the last page that I agree with.
* * * * * *
In this case, there is damages. Most of it can be solved with a money judgment, ...
* * * * * *
Longest TRO I have ever seen. I guess not the longest but pretty close to it. It lays out a whole list of things that it looked like somebody just signed to get you out of the courtroom.
* * * * * *
My problem right now is all I have in front of me is what purports to be an agreement. It may have nothing to do with an agreement... but still when you see it in Court you have got to take what it is as prima facie evidence. Your defense is it is a lot ofit is something that purports to be something that it is not. That may be true, but I would have to have live bodies. I would have to have a permanent injunction hearing, and I am only the duty judge. And I take it as a prima facie situation because it looks like what purports to be legitimate contract.
Ten months later, the trial court's reason for dissolving the injunction echo the above concerns of the duty judge. She opined that the proper remedy in this case was monetary damages and not the harsh, extraordinary remedy of injunctive relief. We find that the record supports that conclusion.
The relevant evidence is that which was presented at the hearing on the preliminary injunction. In our opinion, that evidence fails to support a showing of irreparable *843 harm. While we agree with the legal principles set forth in the cases relied on by HCNO and Palm Tree,[6] those legal principles were not supported by any evidence other than the bare assertions in the petition that they will suffer irreparable harm because the "OASIS business will be destroyed and incapable of being resurrected before a trial on the merits...." The two affidavits supporting the request for injunctive relief say nothing of how the damage is irreparable. They concentrate only on how the alleged agreement with Radosta came into existence. Furthermore, although HCNO and Palm Tree are the plaintiffs, Mark Mueller signed the verification to the petition, not in any corporate capacity, but in an individual capacity. While standing alone that may not be fatal to a preliminary injunction, but when coupled with the total lack of any showing of irreparable harm, reliance on only the petition simply does not suffice.
Finally, although the law recognizes that insolvency may suffice as irreparable damage,[7] the affidavits say nothing of the defendants' financial condition. In fact, the petition alleges that the defendants were in financial trouble long before the alleged contract came into existence.[8] Thus, it can hardly be argued that fear of being unable to collect a money judgment is a sufficient showing of irreparable harm under these circumstances.

ASSIGNMENT OF ERROR 2:
HCNO and Palm Tree assert the trial court erred in awarding damages because the injunction was not wrongfully issued, no damages were proven by defendants, and because SCS and CPI had never made a profit and were losing money when the injunction issued.

THE LAW:
Louisiana Code of Civil Procedure Article 3608 provides:
The court may allow damages for wrongful issuance of a temporary restraining order or preliminary injunction on a motion to dissolve or on a reconventional demand. Attorney's fees for the services rendered in connection with the dissolution of a restraining order or preliminary injunction may be included as an element of damages whether the restraining order or preliminary injunction is dissolved on motion or after trial on the merits. (emphasis added)
A plaintiff is responsible for damages and attorney fees sustained by a defendant as a result of an improperly issued preliminary injunction. See, Denta-Max v. Maxicare Louisiana, Inc., 95-2128 pps. 5-6 (La.App. 4th Cir. 3/14/96), 671 So.2d 995, 998. Dissolution of a preliminary injunction is prima facie evidence of damage for the wrongful issuance thereof. Albert Pick & Co. v. Stringer, 171 La. 131, 129 So. 731, 733 (La. 1930); Succession of Ancar, 421 So.2d 261, 262 (La.App. 4th Cir.1982). Inconvenience and embarrassment have also been held to be appropriate elements of damages. Ancar, supra at 262.
A preliminary injunction is wrongfully issued if it infringes upon some right of the enjoined party regardless of whether or not the injunction was requested on good faith grounds. A wrongful issuance is injunctive relief that has been issued when it should not have been issued because the plaintiff had no right to it. No bad faith need be shown. Cromwell v. Commerce & Energy Bank of Lafayette, 528 So.2d 759, 761-762 (La.App. 3rd Cir.1988). See also, Board of Commissioners of the Orleans Levee District v. Harry F. Connick, 95-1456 (La.App. 4th Cir. 3/14/96), 671 So.2d 1004.
Civil Code article 3608 recognizes as an element of damages, attorney fees for *844 the services rendered in connection with the dissolution. Cromwell, supra at 761. Even where a party fails to introduce evidence of the amount of the attorney fees incurred, the Court, within its discretion, can estimate the value of legal services. Southfield Square Homeowners Ass'n. Inc. v. Myers, 95-1043 p. 5, (La.App. 3rd Cir. 3/6/96), 670 So.2d 639, 642. An award of damages and attorney fees to a successful party on a motion to dissolve a preliminary injunction is discretionary with the trial court and will not be disturbed absent a clear abuse of discretion. Hendrick v. Hendrick, 470 So.2d 449, 457 (La.App. 1st Cir.1985).

ANALYSIS:
In her reasons for judgment, the trial court stated that "[a]fter a review of the financial documentation (tax returns and projection sheets and account records) offered into evidence and the testimony offered into the record, the Court is convinced that the defendants sustained damages...."
We have already determined that the trial court did not abuse its discretion in dissolving the preliminary injunction, thus its wrongful issuance is the necessary result of that finding. After review of the evidence, we cannot say that the award of damages for that wrongful issuance is manifestly erroneous.
Radosta testified that OASIS' gross sales revenues steadily increased from $79,000.00 in 1991 to $280,000.00 in 1994. Support service revenues grew to $150,000.00 per year, which were renewable every year. The total gross revenue for OASIS for 1994, shortly before the injunction issued totaled approximately $500,000.00. The last quarter of 1994 showed a high of $100,000.00. After the injunction, OASIS' gross revenues dropped to zero.
In addition, royalty revenues to CPI from gross sales by Mark Mueller also dropped to zero after the injunction. Prior to the injunction, CPI had been receiving royalty revenues of between $50,000.00 and $60,000.00. These royalty revenues were calculated at 25% of Mueller's gross sales.
Several documents were introduced in support of Radosta's testimony. These were marked as defendant's exhibits 18, 23 and 24.[9] HCNO and Palm Tree argue that these "summary" documents should not have been allowed into evidence because the underlying source documents were not introduced.
While we agree that the underlying source documents would constitute the best evidence, the trial court did not err in admitting these exhibits. Radosta testified as to the origin of the data used to generate the documents and that this data was kept in the ordinary and regular course of the OASIS business. In addition, Radosta was extensively cross examined about the exhibits as well as his supporting testimony. We find no error in admitting them into evidence.
Of the three documents, the cash receipts/disbursement summary and the six month loss projection are the most persuasive. These documents illustrate actual sales receipts and loss projection based on sales for the six month period immediately preceding the injunction. The cash receipts and disbursement summary shows OASIS sales receipts for the last quarter of 1994 in the amount of $136,838.37. This figure alone justifies the $50,000.00 damage award because Radosta's uncontradicted testimony is that sales fell to zero after the injunction was issued. The six month sales projection shows a sales loss of $200,000.00 and a sales royalty loss to CPI of $50,000.00.
Even if the losses testified to by Radosta are only 50% correct, the award of $50,000.00 is justified. Furthermore, the attorney fees necessary to contest the injunction over a ten month period and to have it dissolved undoubtedly would amount to at least a third of the award. We cannot say the award is excessive or that it is not supported by the *845 evidence. The trial judge was not manifestly erroneous in this regard.

ASSIGNMENTS OF ERROR 3, 4, 5 AND 6:
In their application for supervisory writs, SCS, CPI and Radosta complain that the trial court erred in finding them in contempt of the TRO/preliminary injunction in the following respects: by applying the "preponderance of the evidence" standard of proof rather than the correct "beyond a reasonable doubt standard"; by finding that sufficient evidence was presented by HCNO and Palm Tree that Radosta, SCS and CPI willfully disobeyed the courts orders; and that the court levied an excessive fine.

A. Burden of Proof/sufficiency of evidence:

A contempt proceeding incidental to a civil action is civil in nature if its purpose is to force compliance with a court order, but is criminal in nature if its purpose is to punish disobedience of a court order or other conduct that the law defines as contemptuous. Coleman v. Caddo Parish School Board, 25617 CA, 25925 CW and 25931 CW, (La. App. 2nd Cir. 3/31/94), 635 So.2d 1238, 1263, writ denied, 94-1387, 94-1431 (La.7/1/94), 639 So.2d 1171.
In the instant case, the proceedings were criminal in nature because the purpose was to punish SCS, CPI and Radosta for violating the injunction prior to its dissolution. It (the contempt motion) was not for the purpose of compliance and thus the more stringent burden of proof beyond a reasonable doubt was required.
In her reasons for judgment, the trial court stated that "The plaintiff proved by a preponderance of the evidence that the Temporary Restraining Order was violated by Mr. Radosta and, or his agents,...." We agree that the incorrect burden of proof was applied. However, we conclude that pursuant to either burden of proof, the record shows Radosta did knowingly and purposely violate the injunction. The court found that by contacting OASIS customers, interrupting HCNO and Palm Tree's telephone service and running advertisements for the OASIS software, the injunction was violated.
Constructive contempt is the willful disobedience of any lawful judgment, order, mandate, writ, or process of the court. C.C.Pro. art. 224(2). To find a person guilty of constructive contempt, it is necessary to find that he or she violated the order of court intentionally, knowingly, and purposely, without justification. In making this determination, the Court is vested with great discretion. Kirby v. Kirby, 579 So.2d 508, 519 (La.App. 4th Cir.1991), writ den. 582 So.2d 1308 (La.1991); Estate of Graham v. Levy, 93-0636, (La.App. 1st Cir. 4/8/94), 636 So.2d 287, 290, writ den, 94-1202, (La.7/1/94), 639 So.2d 1167.
Radosta argues that it was never his intention to violate the injunction but only to protect SCS and CPI from HCNO's and Palm Tree's unfair trade practices. We disagree. After review of the evidence we conclude that, beyond a reasonable doubt, Radosta is guilty of contempt.
The TRO and preliminary injunction prohibited the conduct admitted to by Radosta, i.e, communicating with OASIS customers, soliciting sales of the OASIS program and services, and interfering with Palm Tree's efforts to operate the OASIS business. Radosta was aware of the TRO and the preliminary injunction.
Telephone communications show Radosta personally contacted OASIS customers.[10] Radosta advertised the OASIS software in hospice magazines under the "MUMMS" tradename.[11] Radosta admitted during the hearing that the MUMMS program had never been used in the hospice industry and had not been developed until two months before the hearings. Nevertheless, in July, 1995, Radosta ran an ad announcing "the next generation of CPI's popular OASIS software package". The ad lists CPI's New Orleans telephone number. Yolanda Mitchell, service representative with Bell South Communications testified that on September 8, 1995, someone from Radosta's New Orleans office *846 ordered the telephone service to the Palm Tree office in Metairie disconnected. The disconnect order was later cancelled after the telephone company spoke to Mark Mueller who denied authorizing the disconnect request.
Thus, given the record before us, we find the evidence was sufficient to support the trial court's finding of contempt beyond a reasonable doubt. Despite the fact that the injunction was wrongfully issued, during the ten month period it was in effect, Radosta, CPI and SCS were bound to obey it.

B. The fine:

Radosta asserts the trial court erred by imposing an excessive fine of $10,000.00 in violation of the specific statutory maximum. HCNO and Palm Tree argue that Radosta committed over 70 separate acts of contempt and that each may be punished separately.[12]
Louisiana Code of Civil Procedure article 227 provides:
A person may not be adjudged guilty of a contempt of court except for misconduct defined as such, or made punishable as such, expressly by law.
The punishment which a court may impose upon a person adjudged guilty of contempt of court is provided in R.S. 13:4611.
Louisiana Revised Statute 13:4611 provides:
Except as otherwise provided by law:
(1) The Supreme Court, the courts of appeal, the district courts, family courts, juvenile courts and the city court may punish a person adjudged guilty of a contempt of court therein, as follows:
* * * * * *
(b) For disobeying or resisting a lawful restraining order, or preliminary or permanent injunction, by a fine of not more than one thousand dollars, or by imprisonment of not more than twelve months, or both, except in juvenile courts and city courts, in which punishment may be a fine of not more than six months, or both.
Following the hearing, the court fined Radosta $10,000.00. Either the Court found ten separate violations of the injunction or the Court imposed a hefty fine because it concluded Radosta's conduct was a blatant disregard of the injunction. For either reason, the fine was incorrect.
This court recently addressed this issue in Reeves v. Thompson, 95-0321 pps. 13-16, (La.App. 4th Cir. 12/11/96), 685 So.2d 575, 581-582. Citing the only Supreme Court authority on the issue, State v. King, 47 La.Ann. 701, 17 So. 288 (La.1895),[13] we concluded that the law does not permit a Court, whose contempt powers are limited,[14] to impose a fine exceeding the maximum *847 allowed by statute. A contrary holding would allow a plaintiff to refrain from filing a contempt rule until the violations added up to an astronomical amount. That is not the intent of the law.
In the instant case, evidence as to all of the alleged violations was heard at the same time as the motion to dissolve. The judgment was pronounced at the same time on all violations. As such, the trial court was only authorized to levy a fine of $1,000.00. We reduce same accordingly.

C. Due Process:

Radosta claims that he was not afforded his due process right to a full and fair hearing on the motion for contempt. Specifically, he asserts that the trial judge abruptly ended the hearing without allowing him to put on his defense. We disagree.
The record shows that Radosta was allowed to assert his defenses to the motion for contempt, which were that he was only trying to protect SCS and CPI's interests. The Court obviously rejected that argument. The record also shows that at the close of the hearing, Radosta requested that he be allowed to introduce additional evidence on damages, not on the issue of contempt. Specifically, he requested that the damage issue be continued so that he could obtain and introduce the records of Palm Tree showing the amount of OASIS business conducted during the pendency of the injunction. The Court denied the request.
We find no evidence that Radosta was denied his due process right to a full and fair hearing on the motion for contempt.

OTHER RELIEF:
In their brief, SCS, CPI and Radosta request an award of attorney fees for frivolous appeal and an order directing HCNO and Palm Tree to turn over all OASIS related business records acquired during the pendency of the injunction in order to assess the damages sustained by SCS, CPI and Radosta in excess of $50,000.00. However, SCS, CPI and Radosta did not appeal or answer the appeal and therefore are not entitled to the relief sought. C.C.Pro. article 2133.
For the reasons assigned above, we affirm the trial court's judgment dissolving the preliminary injunction and the award of damages to SCS, CPI and Radosta. We also affirm the trial court's judgment of contempt, but reduce the fine to $1,000.00.
AMENDED, AND AS AMENDED, AFFIRMED.
PLOTKIN, J., concurs with reasons.
PLOTKIN, Judge, concurring with written reasons:
I agree in all respects with the well-written and well-reasoned opinion of the majority. However, I would note that the cause, in part, of this expensive, complex, lengthy litigation stems from the operation of the Civil District Court Rules of Court, Rule 3, § 4(c), which provides, in pertinent part, as follows:
The duty judge shall order the preliminary injunction be heard on affidavits only.
If the duty judge had been allowed to hold a hearing on the preliminary injunction originally, the improper preliminary injunction issued in the instant case might never have been issued.
NOTES
[1] The defendants-appellees were held in contempt and fined $10,000.00 for violating the preliminary injunction which is the subject of this appeal. They sought supervisory writs to this court challenging that contempt judgment. Writ No. 96-C-1973. We consolidated that writ with this appeal.
[2] For purposes of the issue before us, it is not necessary that we determine whose version is more credible. That will eventually be resolved at the trial on the merits.
[3] Radosta objected to the formation of a new management company because it would have resulted in Radosta losing control of OASIS because one of the Muellers had been given a minority (7%) interest in SCS. According to Radosta, if he had agreed to the formation of the new management company, he would effectively have been replaced as the majority owner of the OASIS business.
[4] The preliminary injunction was granted based only on affidavits. No testimony was taken nor was any other evidence presented. The actual language of the injunction lists seven items to be enjoined. For purposes of this opinion, we need not recite them verbatim. Suffice it to say that the result is to prevent Radosta from doing anything regarding the "OASIS" business.
[5] The Muellers also allege Radosta committed unfair trade practices, tortious interference with a contract and misrepresentation, all of which stem from the alleged breach of contract.
[6] We do note, however, that for various reasons those cases are distinguishable. Most important is the fact that they are appeals from preliminary injunctions where testimony and evidence were submitted in support of the relief sought. In addition, in both Pipe Liners I and Pipe Liners II, the plaintiff was the holder of the licensing agreement seeking to protect from infringement by the defendants. In the instant case, Radosta, the copyright owner is the defendant. The plaintiffs have no rights to the OASIS program unless they can prove the validity of the agreement. Simply put, the "status quo" favors the defendant in this case.
[7] Oestreicher v. Hackett, supra.
[8] Paragraph 16.
[9] Exhibit 18is SCS's cash receipts and disbursements report dated January 1994 to January 1995.

Exhibit 23is an analysis of SCS's and CPI's 6 month lost net income based on Mueller's guaranteed minimum sales.
Exhibit 24is a five year sales projection based on actual sales form 7/94 through 11/95.
[10] Plaintiff's exhibits 8 and 9 provided by South Central Bell via subpoena.
[11] Plaintiff's exhibits 4 and 5.
[12] In support of their argument, HCNO and Palm Tree cite State v. Bullock, 576 So.2d 453 (La.1991) and State v. Woolridge, 95-971 (La. App. 5th Cir. 2/27/96); 670 So.2d 1332. Those cases are not dispositive of the issue. Both involved direct contempt of court. Both defendants engaged in multiple verbal abuse of the trial court.
[13] The issue in King was whether it was proper for the lower court to sentence the petitioner on eight contempt rules, the sentences all pronounced at the same time. In reversing the trial court, the Supreme Court stated;

When the power of the court is invoked to punish for contempt for conducting a saloon contrary to the laws and the injunction of the court, it seems to me the court is called on to inflict the appropriate penalty, not to exceed the maximum of ten days. If it is competent to divide the offense of conducting a saloon in disregard of the law into parts corresponding with the number of nights the saloon has been opened, and thus authorize eight sentences of ten days each, pronounced at the same time, on eight different rules, there would be no potency in the law fixing the maximum penalty for contempt at ten days imprisonment.... The law means punishment for the offense at the outset, to prevent its repetition, and punishment afterwards for the repetition ... If the contempt is permitted to endure for a period of days or weeks or months, it does not seem consistent with the law to punish for that period of disobedience by as many sentences of ten days' imprisonment as there are days or weeks or hours in the period. If that were so, then, if the plaintiff ... had deferred his rules for even a month, the term of imprisonment would have been 300 days. No such theory of the power to punish for contempt can be admitted.... State v. King, supra 17 So. at 288.
[14] Article 5, Section 2 of the Louisiana Constitution provides:

The power to punish for contempt of court shall be limited by law.