895 So.2d 821 (2005)
LAKE BISTINEAU PRESERVATION SOCIETY, INC., et al, Plaintiffs-Appellants,
v.
WILDLIFE AND FISHERIES COMMISSION OF The STATE OF LOUISIANA, et al., Defendants-Appellees.
No. 39,369-CA.
Court of Appeal of Louisiana, Second Circuit.
March 9, 2005.
*822 The Pesnell Law Firm by J. Whitney Pesnell, Billy R. Pesnell, Shreveport, for Appellants.
J. Schuyler Marvin, District Attorney, for Intervenors/Appellees, Bossier Parish Police Jury, Webster Parish Police Jury, and Bienville Parish Police Jury.
Charles C. Foti, Jr., Attorney General, Burton P. Guidry, Charles Francis Perry, Terry Ford Hessick, Assistant Attorney Generals, Thomas Michael Landrum, La. Dept. of Wildlife & Fisheries, for Appellees, The State of Louisiana through Louisiana Wildlife and Fisheries Commission, Secretary Dwight Landreneau and the Dept. of Wildlife and Fisheries of the State of Louisiana.
Before BROWN, WILLIAMS and GASKINS, JJ.
GASKINS, J.
The plaintiffs, Lake Bistineau Preservation Society, Inc. (LBPS),[1] and H.F. Anderson,[2] appeal from a trial court judgment which denied their request for a preliminary injunction to prevent implementation of a plan to lower the water level of Lake Bistineau. We affirm.

FACTS
Lake Bistineau is a 17,200 acre lake or impounded water reservoir located in Bossier, Bienville and Webster Parishes which is essentially a "cypress swamp." Historically it has had problems with heavy infestations of water hyacinth, alligator weed and submerged native aquatic vegetation. These plants, in conjunction with leaf litter *823 from the cypress canopy, have caused a considerable accumulation of organic matter on the lake bed. These factors have caused a decline in the fisheries, resulting in the loss of a spawning habitat of desirable sport fish such as bass. Also, some areas of the lake have become so choked with aquatic vegetation and built-up "muck" they are nearly impassable to boat traffic; this also has adversely affected recreational water activities.
In response to these problems, the Department of Wildlife and Fisheries of the State of Louisiana (DWF) formulated a plan to improve the lake through a series of drawdowns. A drawdown involves opening the gates on the control structure to allow water to flow out to a certain level. This plan called for the water level in Lake Bistineau to be lowered seven feet below its normal pool stage from July 15 of each year until January 31 of the following year for three consecutive years, beginning July 15, 2004. A successful drawdown allows the organic material on the bottom of the lake to be exposed to sunlight and to dry out until it cracks. Drying out with heat and sunlight and exposure to air allow for aerobic decomposition of the organic matter on the lake bottom.
The plaintiffs filed suit on July 1, 2004, seeking a declaratory judgment and injunctive relief. Named as defendants were the Wildlife and Fisheries Commission of the State of Louisiana; the DWF; and the secretary of that department, William Dwight Landreneau. The suit sought a judgment declaring that the defendants had exceeded their powers and authority under the Louisiana Constitution by approving and adopting its plan to lower the water level in Lake Bistineau from July 15 until January 31 for three years.
According to the plaintiffs' petition, when the lake is full with a water level of 141 feet, it covers about 17,500 acres of land. However, when lowered to 134 feet, the water surface is reduced to 7,500 acres while 10,000 acres is exposed. Thus, lowering the lake level will restrict the ability of homeowners, camp owners and commercial marinas to use the lake and will interfere with their property rights.
The plaintiffs alleged that the plan adopted by the defendants exceeds their constitutional powers and is an arbitrary and capricious abuse of the defendants' discretion. They contend that the defendants failed to balance the environmental costs and benefits of the plan against its economic and recreational costs. The plaintiffs also complain that the defendants did not create a record adequately setting out the basic facts and establishing a rational connection between its findings and the decision made, as required under Save Ourselves, Inc. v. Louisiana Environmental Control Commission, 452 So.2d 1152 (La.1984). The plaintiffs also maintain that the defendants failed to consult with other state and federal agencies that have the obligation to protect and conserve resources, e.g., the U.S. Army Corps of Engineers and the Environmental Protection Agency.
A petition of intervention was filed by the governing bodies of the parishes in which Lake Bistineau lies: the Bossier Parish Police Jury, the Webster Parish Police Jury, and the Bienville Parish Police Jury. They asserted that the proposed plan was reasonable and in the best interest of the lake and nearby property owners. They further contended that DWF had properly balanced the environmental costs and benefits along with the economic, social and financial factors. The intervenors opposed the issuance of the preliminary injunction sought by the plaintiffs.
Several exceptions were filed on behalf of the defendants. Filed on July 9, 2004, were the following: an exception of prematurity *824 based upon no complained-of actions having commenced; exception of no cause of action by all plaintiffs based on lack of standing by the plaintiffs; exception of no right of action by LBPS because a corporation has no personal right of action to "enjoy the scenic beauties and qualities of Lake Bistineau"; and exception of improper venue, claiming that the 19th Judicial District Court in East Baton Rouge Parish is the proper venue for suit against DWF. Also filed on July 9, 2004, was the defendants' limited answer to the rule for preliminary injunction in which they pled 10 affirmative defenses or exceptions. Among other things, the defendants asserted that LBPS is a "sham" corporation. In an ex parte motion, the defendants sought disclosure of any possible basis for judicial recusal.
A hearing was held on July 14, 2004. The defendants waived their exception of prematurity. The trial court denied the exceptions of improper venue and no right of action. It found that the plaintiffs had standing. By agreement, the Wildlife and Fisheries Commission was dismissed from the suit.[3] The judge declined to recuse himself as he had no interest in the lake.[4]
In their testimony, John Roussel, DWF assistant secretary, and James Seales, the District I fisheries biologist supervisor, suggested that their plan was the only feasible method to control the aquatic growth of exotic plants in the lake from time to time. Over the years, these plants can overgrow and negatively impact recreational uses of the lake. Their testimony indicated that a drawdown with a July 15 start date would allow the best drying action for the lake bottom while minimizing the impact on recreational activities. Anderson testified that he only questioned the timing of the plan, as the lake previously was lowered after Labor Day. He stated that the lake is used extensively from July 4 to Labor Day.
In its written opinion issued on July 15, 2004, the trial court noted that the plaintiffs essentially challenged the record that DWF used to implement the drawdown plan because it supposedly did not consider economic and other factors. The court distinguished the Save Ourselves case, which involved the Environmental Control Commission (ECC) and its regulations. The trial court found no such exacting regulations in the present case. Based upon the testimony of the DWF witnesses, the court found that all of the factors suggested by the plaintiffs were considered in a manner consistent with La. Const. art. 9, § 1, otherwise known as the "Public Trust Doctrine." The court also concluded that the plan set forth by DWF was the only feasible plan for controlling aquatic growth of exotic plants in Lake Bistineau. The application for preliminary injunction was denied at the plaintiffs' costs. Judgment was signed on July 21, 2004.
The plaintiffs filed a devolutive appeal.

MOTION TO DISMISS
The defendants and intervenors filed a motion to dismiss the appeal. They argue that since the lake was lowered after the denial of the preliminary injunction, the appeal is moot because the act sought to be enjoined has already been accomplished. Although the plaintiffs characterize DWF's proposal as a three-year "plan," the defendants assert that any future *825 drawdowns depend upon analysis of the success of the initial drawdown; thus, there is no justiciable issue before this court. In support of this motion, the defendants filed an affidavit by Bennie Fontenot, the administrator of the Inland Fisheries Division of DWF. He stated that immediately after the denial of the request for preliminary injunction, the lake was lowered and DWF planned to allow the lake to refill in January/February 2005.
In November 2004, this court referred the motion to dismiss the appeal to the merits. Finding that this matter is one "capable of repetition, yet evading review"[5] and thus not rendered moot, we now deny the motion.

ARGUMENT
The plaintiffs argue that the crucial issue here is whether the defendants properly considered the economic impact of the drawdowns on the businesses on the lake and the other impacts upon those who use the lake for recreational purposes. They contend that the defendants exceeded their authority and violated their constitutional and statutory duties. Since the case involved the application for a preliminary injunction, they maintain that the trial court should have focused on whether they made a prima facie showing that the DWF plan was invalid or that the DWF failed to perform its fiduciary duties as primary public trustee of the lake by adequately considering the economic and recreational impacts of the plan.
The defendants assert that the evidence showed that the lake was in need of immediate action to solve the problem with the overgrowth. The plan established by the DWF was a "fluid" plan reacting to changing circumstances. The defendants insist that they have fulfilled their responsibility as a public trustee to make sure that adverse environmental impacts have been minimized as much as possible. They distinguish the Save Ourselves case as involving the failure of the ECC to follow its own mandatory statutes, whereas the DWF has no such statutes or regulations. Also, they argue that the Public Trust Doctrine as set forth in the Save Ourselves case has been almost exclusively applied to challenge permit decisions by the Department of Environmental Quality or its predecessor, the ECC. In support of its arguments, the defendants cite Avenal v. State of Louisiana, XXXX-XXXX (La.10/19/04), 886 So.2d 1085, where the court found that the state had a duty to preserve the Louisiana coast. Likewise, the DWF has an obligation to preserve Lake Bistineau. Even though the defendants maintain that there was no mandatory balancing process, they argue that the testimony of its staff members showed that they did all they could to lessen adverse impact on the lake's recreational users.
Counsel for the intervenors adopted the brief filed by the defendants.

LAW
A preliminary injunction is an interlocutory procedural device designed to preserve the existing status pending a trial of the issues on the merits of the case. HCNO Services, Inc. v. Secure Computing Systems, Inc., 96-1693 (La.App. 4th Cir.4/23/97), 693 So.2d 835, writ denied, 97-1353 (La.9/5/97), 700 So.2d 513. To obtain a preliminary injunction, the applicant must show that the damage he will suffer may be irreparable if the injunction does not issue, that he is entitled to the *826 relief sought, and must make a prima facie showing that he will prevail on the merits of the case. HCNO Services, Inc., supra.
The denial or dissolution of a preliminary injunction should not be overturned on appeal absent a clear abuse of the trial court's great discretion. Wallace C. Drennan, Inc. v. Sewerage & Water Board of New Orleans, XXXX-XXXX (La.App. 4th Cir.10/3/01), 798 So.2d 1167.
The "Public Trust Doctrine" is embodied in La. Const. art. 9, § 1, and provides:
The natural resources of the state, including air and water, and the healthful, scenic, historic, and esthetic quality of the environment shall be protected, conserved, and replenished insofar as possible and consistent with the health, safety, and welfare of the people. The legislature shall enact laws to implement this policy.
In the Save Ourselves case, the Louisiana Supreme Court considered this doctrine:
The Constitutional standard requires environmental protection "insofar as possible and consistent with the health, safety, and welfare of the people." La. Const. art. IX § 1. This is a rule of reasonableness which requires an agency or official, before granting approval of proposed action affecting the environment, to determine that adverse environmental impacts have been minimized or avoided as much as possible consistently with the public welfare. Thus, the constitution does not establish environmental protection as an exclusive goal, but requires a balancing process in which environmental costs and benefits must be given full and careful consideration along with economic, social and other factors.
...
The environmental protection framework vests in the [ECC] a latitude of discretion to determine the substantive results in each particular case. Environmental amenities will often be in conflict with economic and social considerations. To consider the former along with the latter must involve a balancing process. In some instances environmental costs may outweigh economic and social benefits and in other instances they may not. This leaves room for a responsible exercise of discretion and may not require particular substantive results in particular problematic instances. [Emphasis ours.]

DISCUSSION
DWF's drawdown plan was geared to "try and slow the aging process of the lake, improve suitable spawning habitat, control the submerged aquatic vegetation and improve the fisheries habitat on Lake Bistineau." As pointed out by DWF, a drawdown is not a new method of treating problems at Lake Bistineau. While a 1983 drawdown was successful in killing unwanted vegetation, fall/winter drawdowns in 1996 and 2000 were only partially successful due to heavy rains. Because of these results, DWF concluded that a fall/winter drawdown in a typical year would not provide enough drying action on the lake bottom. (Fall/winter drawdowns generally begin after Labor Day.) Instead, a mid-summer/winter drawdown was considered to be the most effective method of ensuring maximum drying action.
Dredging, which is "extremely costly," was rejected by DWF as not being economically feasible. Also, the presence of the cypress canopy prevented aerial spraying, and some areas of the lake are inaccessible by boat. However, to the extent possible, aggressive spraying was part of DWF's plan.
*827 From an economic viewpoint, the drawdown is the least expensive; it involves opening the gates of the lake control structure. Dredging was estimated to cost in the tens of millions, as would the microbial insertion method suggested by the plaintiffs.
Seales, the biologist who formulated the habitat management plan at issue here, testified that he considered all aspects  environmental, geographical, people  and his plan was the most reasonable, feasible, and economic one that DWF could develop. He readily conceded that he was not an economist, and it was stipulated that no research on property values was conducted. However, he was aware of information from residents and business owners about the decline of, respectively, their property values and businesses due to the deteriorating habitat. He testified that DWF had received numerous complaints about the accumulated "muck" and vegetation which were obstructing access to properties on the lake.
Under the Public Trust Doctrine, DWF has an obligation to protect the Louisiana environment. It is readily apparent that various factors must be considered in pursuit of this goal. However, like the trial court, we do not find that DWF has the same extensive regulations that bound the ECC in the Save Ourselves case.
Contrary to the plaintiffs' assertions, they did not make a prima facie case that DWF failed to adequately consider the economic and recreational impacts of the plan. DWF considered all relevant factors, including the economic impact upon marina owners. While there will be a temporary negative impact upon such business owners, the evidence indicates that they would also suffer long-term adverse effects if no action was taken to remedy the ever increasing problem with the accumulating muck and aquatic vegetation. In fact, Seales testified that some areas of the lake may already have suffered irreparable injury.
The record indicates that, to the extent that it was required to do so, DWF considered the various and competing interests related to the drawdown and reached a decision as to the best and most reasonable course to follow. In addition to being the most cost-efficient, the plan adopted by DWF also appears to have the greatest chance of success. Unfortunately for the plaintiffs, the plan simply had an earlier start date than they preferred.
We affirm the trial court's judgment. We note that this denial of a preliminary injunction directly addresses an action that has already occurred, the first drawdown. This ruling does not prevent a trial on the merits which may be held prior to the next scheduled drawdown. At that time, any intervening or new considerations may be presented, including the results of the first drawdown.

CONCLUSION
The trial court judgment denying the plaintiffs' application for preliminary injunction is affirmed. Costs of this appeal are assessed against the plaintiffs, Lake Bistineau Preservation Society, Inc., and H.F. Anderson.
AFFIRMED.
NOTES
[1] LBPS is a nonprofit membership corporation formed to preserve Lake Bistineau. Its members include homeowners, camp owners, business owners, and persons who use the lake for recreational purposes.
[2] Anderson owns a camp on the lake. He is also president of LBPS.
[3] On July 14, 2004, the plaintiffs filed a first amending petition in which they removed the Wildlife and Fisheries Commission as a defendant.
[4] This appeal was taken only from the trial court's denial of the preliminary injunction. The court's rulings on these other matters were not challenged.
[5] Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980).