706 So.2d 553 (1998)
METRO RIVERBOAT ASSOCIATES, INC.
v.
BALLY'S LOUISIANA, INC.
No. 97-CA-1672.
Court of Appeal of Louisiana, Fourth Circuit.
January 14, 1998.
Rehearing Denied February 17, 1998.
*554 Daniel Lund, Stephen P. Schott, Montgomery, Barnett, Brown, Read, Hammond & Mintz, L.L.P., New Orleans, and James G. Hunter, Jr., Latham & Watkins, Chicago, IL, for Defendant/Appellant Bally's Louisiana, Inc.
Richard A. Goins, Ronald J. Triche, The Goins Law Firm, New Orleans, and William W. Hall, William W. Hall & Associates, Metairie, and Michael J. Almerico, Metairie, for Plaintiff/Appellee Metro Riverboat Associates, Inc.
Before KLEES, LOBRANO and MURRAY, JJ.
MURRAY, Judge.
In this contractual dispute, defendant Bally's Louisiana, Inc. appeals the trial court's denial of its demand for arbitration as well as the court's grant of a preliminary injunction in favor of the plaintiff, Metro Riverboat Associates, Inc. We affirm the judgment in part and vacate it in part, and remand for further proceedings consistent with this opinion. In addition, we deny plaintiff's motion to supplement the appellate record.

*555 FACTS AND PROCEEDINGS BELOW
In June 1993, Belle of Orleans, L.L.C. (Belle Company) was formed by Metro Riverboat Associates, Inc. (Metro) and Bally's Louisiana, Inc. (Bally's), two Louisiana corporations, for the purpose of owning and operating a gambling riverboat in Orleans Parish. Two months later, a comprehensive Operating Agreement was executed by Metro and Bally's to govern their respective rights and obligations in the conduct of Belle Company's business affairs, including capital contributions, voting rights, distribution of income and allocation of losses, and the resolution of disputes. Although Metro had a majority ownership interest under this contract, the Operating Agreement essentially required the consent of both members for any significant business decisions.
In conjunction with the Operating Agreement, Belle Company and Bally's[1] entered into an equally detailed Management Agreement to govern the operations of the casino itself. This contract was signed on behalf of Belle Company, as owner, by both Metro and Bally's on the same date as the Operating Agreement. A state gaming license subsequently was awarded to Belle Company, and "Bally's Casino Lakeshore Resort" began operations in July 1995 in accordance with the applicable agreements.
The instant litigation was triggered by the December 1996 merger of Bally Entertainment Corporation into Hilton Hotels Corporation. Under Metro's interpretation of the Operating Agreement, this transaction resulted in a "change of control," an event which was defined as permitting most decisions to be made by a simple majority rather than by unanimous consent. Additionally, because Hilton Hotels had an ownership interest in another Orleans Parish riverboat casino,[2] Metro interpreted the merger to result in Bally's violation of the noncompetition provision of the Operating Agreement. The contract provided that, unless cured, this default would deprive Bally's of any voting rights and could lead to the dissolution of Belle Company.
Metro made these interpretations clear to Bally's at a members' meeting conducted by telephone in February 1997. Minutes prepared by Metro's sole shareholder, Norbert Simmons, reported that eight resolutions had been passed, despite Bally's negative votes. The resolutions authorized actions that previously had required unanimity. Following that meeting, Mr. Simmons, purporting to act on behalf of Belle Company, directed Bally's, in its capacity as manager of the casino, to make significant changes in routing revenues and certain expense payments in order to comply with those resolutions. In a separate letter, Metro notified Bally's that it had thirty days to cure its breach of the Operating Agreement's noncompetition clause.
Asserting that the transaction with Hilton Hotels had no impact on their contracts, Bally's responded with its own notice of breach as well as a formal request for a meeting, which was the first step in the dispute resolution procedures outlined in the Operating Agreement. Both parties then agreed to a brief "stand still" period to attempt a negotiated settlement.
At the expiration of the "stand still" period Bally's made written demand on Metro for binding arbitration of all their differences, asserting that this was required by the Operating Agreement. However, that same day, Metro filed this suit asking that Bally's be prohibited from pressing any demand for arbitration and that it be ordered to implement the resolutions passed at the February meeting pending judicial interpretation of the contracts. After the parties presented testimony and evidence on Metro's motion for a preliminary injunction, the matter was taken under advisement.
On April 18, 1997, the trial court granted Metro's motion for a preliminary injunction and ordered Bally's to (1) specify signatories *556 for a new Belle Company checking account under Metro's control; (2) transfer all casino revenues except that needed for daily operations and its management fees to the new Belle Company checking account; and (3) to disburse funds from the new checking account in accord with Metro's directives as controlling member of Belle Company. In addition, Bally's was prohibited from proceeding with its demand for arbitration and from taking any action on its assertion that Metro had breached the Operating Agreement. In separate reasons for judgment, the court explained that the issues in dispute were not within the scope of the arbitration clauses of either the Operating or Management Agreements, and that the December 1996 Bally-Hilton merger represented both a violation of the Operating Agreement's noncompetition provision and a change of control under the language of that contract.
Bally's appeals the judgment granting the preliminary injunction, asserting that the prohibition of arbitration was erroneous (assignments of error 1, 2 and 3) and that Metro did not establish that it was entitled to injunctive relief (assignments of error 4 and 5). In addition to arguing in support of the judgment, Metro moves to supplement the appellate record with additional documentary evidence. We will address each of these issues separately below.

ARBITRATION
Article XIII of the Belle Company Operating Agreement is entitled "Dispute Resolution" and consists of two sections, 13.01 "Notice of Dispute; Arbitration" and 13.02 "Failure to Arbitrate." Section 13.01(a) is the provision at issue here:
In the event a dispute arises between any two (2) Members with respect to the management or operation of the [Belle] Company, either such member (the "Notifying Member") may deliver written notice to the other such member (the "Responding Member") of a date... on which the Notifying Member is prepared to meet with the Responding Member to resolve the dispute.... If the Members are unable to resolve a dispute involving a Major Decision [as enumerated and defined in Section 5.02] at the meeting... or if either Member fails to attend the meeting without a good faith material basis for their absence, then, except as otherwise specifically provided in this Agreement, either of the Members may elect... to submit such disagreement or dispute to binding arbitration....
Bally's asserts that the trial court's failure to order arbitration in the face of this provision violated the Louisiana Arbitration Law, La. R.S. 9:4201 et seq., which has been interpreted to require that "[o]nce the court finds an agreement to arbitrate and a failure to comply therewith, the court shall order arbitration," Matthews-McCracken Rutland Corp. v. City of Plaquemine, 414 So.2d 756, 757 (La.1982) (citation omitted; emphasis in original). Bally's thus contends that because the Operating Agreement clearly includes an arbitration clause and there is no assertion that the contract is unenforceable, any further "questions of procedural arbitrability" must be referred to the arbitrator, as the Supreme Court held in Bartley, Inc. v. Jefferson Parish School Board, 302 So.2d 280, 283 (La.1974). Bally's further argues that even if a court may decide what is and what is not arbitrable, the district court's prohibition of arbitration in this case resulted from the misinterpretation of the language of the Operating Agreement.
We first reject Bally's contention that because an arbitration clause appears in the Operating Agreement, the law requires referral to an arbitrator for any further decision. Instead, La. R.S. 9:4202 makes clear that court proceedings will be stayed when "brought upon any issue referable to arbitration" and then only if the court is "satisfied that the issue involved ... is referable to arbitration." This statute gives recognition to the fact that under Civil Code article 3102, "[p]arties may submit either all their differences, or only some of them in particular" to arbitration. If the parties to a contract have explicitly agreed to submit all disputes to an arbitrator,[3] then a determination *557 that the contract is valid will necessarily suffice to require enforcement of the arbitration clause. However, if the parties' agreement to arbitrate is limited to particular issues or types of disputes, the language of 9:4202 expressly requires the court, rather than the arbitrator, to further determine whether the particular issue in dispute is within the scope of the arbitration clause. We find that the agreement to arbitrate in this case is limited, so that the trial court was required to determine if the dispute herein was within the scope of that agreement.
Bally's asserts that the current disputes clearly are within the scope of Section 13.01's arbitration agreement because the interpretation of the provisions of the Operating Agreement regarding change of control and noncompetition can result in a significant alteration of the parties' voting rights, which "go to the heart of the management and operation of any company." Bally's argues that the nature of the conflicts resulting from the alleged change of control, such as control of revenues and bank accounts, demonstrates that the determination of whether there has been a change of control or a breach of the noncompetition provision necessarily constitute disputes "with respect to the management or operation of the Company." Bally's insists, therefore, that the parties should be ordered to submit to arbitration, rather than prohibited from demanding same.
Metro counters that the language of Section 13.01 clearly excludes the current conflict from that which the parties intended to submit to arbitration. It emphasizes that the Operating Agreement does not provide for arbitration of "any claim or controversy arising out of this contract," a clause often used in commercial contracts. Rather, it specifies a limited range of disagreements to be arbitrated, those "with respect to the management and operation of the Company." Metro further argues that the actual controversy giving rise to this litigation relates only to the interpretation of contractual language regarding change of control and noncompetition, although it acknowledges that the resolution of those provisions ultimately will affect how the company is managed and operated. Metro contends, therefore, that the trial court properly rejected Bally's demand for arbitration of this dispute. We agree.
The fundamental dispute in this case is the interpretation of contractual language regarding a change of control and noncompetition, not whether a particular resolution regarding the management or operation of the company should be approved or rejected. If it ultimately is determined that there was no change of control or breach of the noncompetition agreement then none of the resolutions presented at the February members' meeting was validly approved, and the parties continue to share the control of Belle Company. Conversely, as Bally's apparently concedes, if the Bally-Hilton merger was a "change of control" as defined in the Operating Agreement or if it resulted in a violation of the noncompetition clause of that Agreement, then the February resolutions were passed validly and must be implemented. Therefore, the question presented is whether a disagreement concerning interpretation of contractual language was intended to be arbitrated as "a dispute ... with respect to the management and operation of the Company." Based upon the principles of contractual interpretation set forth in Civil Code articles 2045-57, we find that it was not.
Despite Bally's assertion that the parties desired to avoid any delay and expense of litigation, it is clear that Section 13.01(a) does *558 not say that all disputes shall be resolved under the procedures set forth therein. Furthermore, because the very purpose of the Operating Agreement is the regulation of the members' respective rights in managing and operating their company, the limitation expressed by the phrase "with respect to the management and operation" is superfluous if we were to adopt Bally's interpretation that those dispute procedures were intended to apply to every disagreement affecting the members' rights. Civil Code article 2049, which requires that a provision "be interpreted with a meaning that renders it effective and not with one that renders it ineffective," does not permit such an interpretation. Therefore, the phrase cannot be seen as anything other than an expression of the parties' intent to limit the type of dispute subject to resolution under Section 13.01(a).
The limiting effect of the language at issue in the Operating Agreement is further evidenced by comparing it to the dispute resolution provisions in the Management Agreement, a relevant consideration under Civil Code article 2053. In that ancillary contract, Section 17.1 outlines the same procedures as in the Operating Agreement: if a formal meeting fails to result in resolution, then either party may seek binding arbitration. However, the Management Agreement specifies that those procedures apply to any dispute "with respect to the terms of this Agreement." Unlike the wording at issue herein, this broad language would encompass a disagreement that did not directly concern a particular management decision, but that could nevertheless have an impact on the casino's operations. Had the parties intended the arbitration clause in the Operating Agreement to be as broad as Bally's argues, language similar to that in the Management Agreement would have been used in both contracts.
We thus find that the lower court correctly rejected Bally's demand for arbitration under these facts. Resolution of the present controversy requires interpretation of the Operating Agreement's definitions of "change of control" and the corporate relationships which would violate the noncompetition provision. Although resolution of this controversy may affect the management and operation of Belle Company, the interpretation of contractual terms is not "a dispute ... with respect to the management and operation of the Company" as required to trigger the arbitration clause at issue. For these reasons, the portion of the judgment below which prohibits Bally's Louisiana, Inc. from proceeding with its demand for arbitration is affirmed.

INJUNCTIVE RELIEF
Bally's next asserts that issuance of a preliminary injunction was improper because Metro did not establish that it was threatened with irreparable harm, as required by Article 3601 of the Code of Civil Procedure. Additionally, because the injunction compels it to act in accordance with the allegedly invalid Belle Company resolutions, Bally's contends that the status quo has been changed, rather than maintained, which is contrary to the law and jurisprudence. Therefore, the injunction should be dissolved.
Metro claims, however, that because the injunction merely enforced Bally's obligation not to violate the Operating Agreement or the resolutions passed pursuant to that contract, no showing of irreparable injury was required under Civil Code article 1987. Alternatively, it is argued that Mr. Simmons' testimony established that injunctive relief was required to prevent imminent harm to Belle Company's competitive position, its loss of business reputation, and a possible loss of its gaming license, none of which is compensable by money damages. Finally, Metro contends that since it is permissible to alter the status quo through the issuance of a mandatory, rather than prohibitory, preliminary injunction under this court's holding in Denta-Max v. Maxicare Louisiana, Inc., 95-2128 (La.App. 4th Cir. 3/14/96), 671 So.2d 995, issuance of this injunction should be affirmed.
Injunctive relief is available only when the applicant shows that "irreparable injury, loss, or damage may otherwise result." La.Code Civ. Proc. Ann. art. 3601. A preliminary injunction may be granted pending a trial on the merits of a permanent injunction in order to preserve the pre-existing *559 status of the parties. HCNO Services, Inc. v. Secure Computing Systems, Inc., 96-1693, 96-1753, p. 10 (La.App. 4th Cir. 4/23/97), 693 So.2d 835, 841, writ denied, 97-1353 (La.9/5/97), 700 So.2d 513. Issuance of a preliminary injunction generally requires a prima facie showing that the petitioner will prevail on the merits and that the potential losses are those for which money damages are inadequate or are incapable of measurement by pecuniary standards. Shaw v. Hingle, 94-1579, pp. 4-5 (La.1/17/95), 648 So.2d 903, 905; HCNO Services at pp. 10-11, 693 So.2d at 841-42. However, a mandatory preliminary injunction that orders a party to take specific action(s) "has the same basic effect as a permanent injunction, and therefore may not be issued on merely a prima facie showing." Denta-Max at p. 3, 671 So.2d at 997; Bollinger Machine Shop & Shipyard, Inc. v. U.S. Marine, Inc., 595 So.2d 756, 759 (La.App. 4th Cir.), writ denied, 600 So.2d 643 (La.1992). Instead, such an order "may only be issued after a full evidentiary hearing where the standard of proof is by a preponderance of the evidence." Bollinger Machine, 595 So.2d at 759.
Metro contends that the standard for mandatory injunctive relief was met in this case because the trial court based its determination upon an analysis of both the Operating and Management Agreements and all relevant letters, notices and minutes issued by the parties, as well as the affidavits of Norbert Simmons and Dennis P. Venuti, Bally's Vice President of Legal Affairs. Although only Mr. Simmons actually testified at the hearing, Metro asserts that this was because Bally's chose not to call any witnesses. Because the trial court's judgment was thus based upon all the evidence presented, Metro maintains that it has carried its burden of proving its entitlement to a mandatory preliminary injunction by a preponderance of the evidence.
As we have previously noted, the decision on the merits of this dispute will rest upon whether the Bally-Hilton merger either constituted a "change of control" as defined in the Operating Agreement or resulted in a violation of the noncompetition clause of that contract. The sections primarily at issue[4] provide as follows:
Section 5.04 Affiliates. As used herein, "Affiliate" of a Member means: (i) any stockholder, director or officer of a Member which is a corporation; (ii) any partner in a Member which is a partnership; (iii) any corporation, partnership, trust, limited liability company or other entity controlled by or under common control with such Member and any controlling stockholder, director, executive officer, trustee, partner or member of such entity; and (iv) any corporation, partnership, trust, limited liability company or other entity controlling, directly or indirectly, such director, executive officer, trustee, partner or member of such entity. Each Member understands and acknowledges than [sic] the conduct of the business of the Company may involve business dealings with other businesses or undertakings of Bally [Manager], Bally Member or their Affiliates.
Section 5.05 Non-Competition. The creation of the Company and the assumption by the Members of their duties thereunder shall be without prejudice to the rights of the Members (or the rights of their Affiliates) to maintain, expand or diversify other interests and activities including, but not limited to, gaming interests and activities, and to receive and enjoy profits or compensation therefrom. Notwithstanding the preceding sentence, no Member may engage in any gaming venture (other than [Bally's Casino Lakeshore Resort]) in Orleans Parish or Jefferson Parish. Within the [surrounding] parishes ... (the "Other Parishes"), (i) Bally Member and its Affiliates can provide management services ...; provided that neither Bally Member nor its Affiliates (as the case may be) may own an equity interest in such ventures ....
* * * * * *
Section 5.09 Approval of Members; Change of Control.

* * * * * *

*560 (b) For purposes of this Agreement, "Change of Control" means such time as.... BMC [Bally Manufacturing Corporation] consolidates or merges with or into another entity or conveys, transfers or leases all or substantially all of its assets to any entity in one transaction or a series of related transactions, or any entity consolidates or merges with or into BMC and in any such event the holders of the voting stock of BMC immediately prior to such transaction or series of transactions shall beneficially own, directly or indirectly, less than fifty percent (50%) of the voting stock of the surviving entity immediately after such transaction or series of transactions, provided, however, that neither the merger or consolidation or sale of assets by BMC or any Affiliate with or into or to any of BMC [sic] or any Affiliate nor the liquidation or dissolution of the non-surviving entity or transferor following any such transaction shall be deemed a Change of Control....
According to Mr. Venuti's affidavit, Hilton Hotels Corporation owned stock in Bally Entertainment Corporation (successor to Bally Manufacturing Corporation) prior to December 1996, and therefore was an "Affiliate" under Section 5.04(i). Since Section 5.09(b) exempts a merger or consolidation between BMC and an Affiliate from the definition of "Change of Control," Mr. Venuti opined that Metro did not thereby acquire any additional voting power. Similarly, he averred that Section 5.05 prohibited competition in Orleans Parish only by Bally's Louisiana, Inc., rather than any other related company, since the sentence at issue refers to a "Member" and not a "Member or Affiliate."
The only evidence presented by Metro in the court below to support its position on these questions, and thus its entitlement to the relief sought, was the testimony of Norbert Simmons. Mr. Simmons acknowledged the existence of various separate but related corporations bearing the name "Bally's" and admitted that despite the merger, he has continued to deal with the same people, who are now officers in Hilton's gaming division. However, his "understanding" is that the decisions now are made by the Board of Directors of Hilton, a publicly traded company, and that Bally's "was essentially consumed in a stock swap. And as I understand, Bally's no longer exist [sic]. They are no longer on the stock exchange and the surviving member is the Hilton." Mr. Simmons testified that he did not know whether Hilton had owned any Bally's stock, but he believed the mechanics of the merger to be irrelevant because Section 5.09(b) was intended to change the voting rights if any company other than Bally Entertainment became his "partner" in Belle Company.
We do not find that this limited evidence preponderates in favor of Metro's interpretation of the technically detailed provisions of the Operating Agreement. Neither party submitted anything to support its views concerning either the intended scope of Sections 5.05 and 5.09(b) or the actual pre- and post-merger corporate relationship between Hilton Hotels, Bally Entertainment and Bally's Louisiana, Inc., with which Metro had contracted. Instead, there is only the testimony of a representative from each side to explain why it has taken the position that led to this litigation. Although Mr. Simmons' testimony contradicted that offered by Bally's, the weight of that testimony is diminished by his admission that he neither knew of any prior relationship between Bally Entertainment and Hilton, nor was he concerned with the "mechanics" of their merger. Because Metro's evidence thus does not outweigh Bally's evidence, it is insufficient to meet the heightened burden of proof imposed for issuance of a mandatory preliminary injunction. Therefore, the portion of the trial court's judgment ordering Bally's to take specific actions to implement Metro's resolutions is vacated, and the matter is remanded for a new evidentiary hearing.

MOTION TO SUPPLEMENT
Metro has moved to supplement the appellate record with certain documents that had been submitted to the U.S. Securities and Exchange Commission and the Gaming Division of the Louisiana Department of Justice in connection with the Bally-Hilton merger. Metro asserts that in deciding this appeal, this court should take judicial *561 notice of the following statements contained in these documents:
The transactions contemplated by the Merger Agreement constitute a "change in control" under [Belle Company's] Operating Agreement. In addition, certain covenants in the Operating Agreement relating to non-competition by its Members may be breached by [Hilton].
Bally's correctly notes, however, that for this court to rely upon documents which were not introduced into evidence in the trial court "would constitute the taking of evidence and the exercise of original jurisdiction" beyond this court's authority. White v. West Carroll Hospital, Inc., 613 So.2d 150, 154 (La.1992). We further note that Bally's is entitled to the opportunity to be heard concerning both the propriety of taking judicial notice, La.Code Evid. Ann. arts. 201-02, as well as whether the referenced statements constitute extrajudicial admissions, see, e.g., Alexis v. Metropolitan Life Ins. Co., 604 So.2d 581, 582 (La.1992), and sources cited therein. Accordingly, Metro's motion to supplement the appellate record is denied.

CONCLUSION
Because the parties' agreement to arbitrate disputes "with respect to the management and operation of their company was not intended to include a disagreement as to contractual interpretation that merely affected their respective management rights, the prohibitory preliminary injunction is affirmed. However, because Metro did not establish by a preponderance of the evidence that it was likely to prevail concerning the interpretation of Sections 5.04, 5.05 and 5.09(b) of the Operating Agreement, the mandatory preliminary injunction is vacated. The matter is remanded to the trial court for further proceedings, including consideration of the admissibility and weight to be given the documents proffered in this court.
AFFIRMED IN PART, VACATED IN PART AND REMANDED; MOTION TO SUPPLEMENT DENIED.
NOTES
[1] The Management Agreement was originally between Belle Company and Bally's Casino Holdings, Inc., a Delaware corporation, which later assigned its rights and obligations under this contract to Bally's Louisiana, Inc.
[2] Hilton's Flamingo Casino riverboat continued to operate in New Orleans until October 1, 1997, although it had been authorized to move to Shreveport prior to the merger.
[3] Our review of the cases offered by Bally's in support of this argument suggest that this is the typical agreement. See Sun Belt Constructors v. Plaquemines Parish Govt., 590 So.2d 832, 832 n. 1 (La.App. 4th Cir.1991) ("All claims disputes and other matters in question ... arising out of,... or relating to, the contract documents or the breach thereof,..."); Matthews-McCracken, 414 So.2d at 757 n. 1 ("Any controversy or claim arising out of or relating to this contract, or breach thereof...."); Willis-Knighton Medical Center v. Southern Builders, Inc., 392 So.2d 505, 507 n. 3 (La.App. 2d Cir.1980) ("All claims, disputes and other matters in question arising out of, or relating to, this Contract or the breach thereof...."); Waterworks District No. 1 v. Babin, 393 So.2d 282, 283 (La.App. 1st Cir.1980) ("All claims, disputes and other matters in question arising out of, or relating to, this Agreement or the breach thereof...."); Bartley, Inc., 302 So.2d at 282 n. 2 ("All claims, disputes and other matters in question arising out of, or relating to, this Contract or the breach thereof....").
[4] Section 2.5 of the Management Agreement, entitled "Other Bally Casinos," might also be relevant as to the violation of the noncompetition clause but will not be quoted here.