**METRO RIVERBOAT ASSOCIATES, INC.,**

v.

**BALLY'S LOUISIANA, INC., et al.**

No. CIV.A.99–2660, 00–2532, 00–0353.

United States District Court, E.D. Louisiana.

April 2, 2001.

John J. Cummings, III, Cummings, Cummings & Dudenhefer, New Orleans, LA, Michael X. St. Martin, Conrad S.P. Williams, III, St. Martin & Williams, Houma, LA, Thomas Warren Tucker, Lisa C. West, Tucker & West, New Orleans, LA, Thomas M. Crisham, David M. Jenkins, Frank M. Adams, Quinlan & Crisham, PC,

Chicago, IL, for Metro Riverboat Asssociates, Inc.

Daniel Lund, Stephen P. Schott, Jeffrey Scott Loeb, Montgomery, Barnett, Brown, Read, Hammond & Mintz, New Orleans, LA, James A. Cherney, Michael S. Lieb, Latham & Watkins, Chicago, IL, for Bally's Louisiana, Inc. and Bally's Midwest Casino, Inc.

Phillip A. Wittmann, Karen Hayne Freese, Michael Q. Walsh, Jr., Stone, Pigman, Walther, Wittmann & Hutchinson, LLP, New Orleans, LA, Anton R. Valukas, Thomas J. McCarthy, Gregory M. Boyle, Jenner & Block, Chicago, IL, for Arthur M. Goldberg.

John Robert Martzell, Scott R. Bickford, Marcia Suzanne Montero, Martzell & Bickford, New Orleans, LA, James A. Cherney, Michael S. Lieb, Latham & Watkins, Chicago, IL, for Wallace R. Barr.

Harry Rosenberg, Jennifer L. Burrows, David P. Steiner, Phelps Dunbar, LLP, New Orleans, LA, Donald A. Tarkington, Stephen J. Siegel, Novack & Macey, Chicago, IL, for Hilton Hotels Corporation.

Steven A. Block, Latham & Watkins, William J. Harte, William J. Harte, Attorney at Law, Chicago, IL, for Bally Intermediate Casino Holdings, Inc.

## ORDER AND REASONS

DUVAL, District Judge.

Before the Court are Bally's Louisiana, Inc., Bally's Midwest Casino, Inc., and Hilton Hotels Corporation,[1] defendants', Joint Motion to Dismiss Pursuant to FRCP Rule 12(b)(6) and Rule 9(b) filed in the Metro Riverboat Associates, Inc.'s case (Doc. 29 in C.A. No. 99–2660) (the "Metro" case) and Bally's Louisiana, Inc., Bally's Midwest Casino, Inc. and Hilton Hotels Corporation, defendants, Joint Motion to Dismiss Pursuant to FRCP Rule 12(b)(6) and Rule 9(b) filed in the Norbert A. Simmons case (Doc. 3 in C.A. 00–0353) (the "Simmons" case). The two cases have since been consolidated along with a third suit originally filed in Chicago styled *Bally's Intermediate Holdings, Inc. v. Metro Riverboat Associates, Inc.*, C.A. No. 00–2532. The first two actions were brought solely under the civil remedy provisions of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964. The third suit seeks judgment on a promissory note executed by Norbert Simmons and guaranteed by Metro. Defenses urged in that suit include allegations of fraud that dove-tail with the RICO violations alleged in the first two suits. In the subject motions, defendants seek dismissal of the two RICO cases contending that (1) plaintiffs lack standing to bring a RICO claim and that (2) plaintiffs have not alleged the required elements of a RICO claim.

This dispute, at its core, concerns control of a river boat license and of the profits derived therefrom. The First Amended and Restated Complaint in the Metro Riverboat Associates, Inc. (the "Complaint") suit is 76 pages in length. The RICO Case Statement is 70 pages. The Court has painstakingly reviewed these two pleadings. It has also reviewed the Louisiana Gaming Control Law, La. Rev.Stat. 27:3 *et seq.* In addition, the Court has independently reviewed rulings from certain administrative hearings and appeals therefrom, as well as opinions rendered in on-going state court litigation. The subject matter of the Hydra-headed state litigation provides the factual underpinnings for the core of plaintiffs' allega-

---

1. Bally's Casino Holdings, Inc. and Bally's Intermediate Casino Holdings, Inc. were merged out of existence at December 1998. As such they have not been served in this matter.

tions of unlawful conduct upon which plaintiffs' federal RICO allegations rest. Having taken judicial notice of the outstanding administrative proceedings and state court litigation and having found that it is inextricably intertwined with any decision this Court could render on the claims before it, the Court ordered the parties to provide the Court with a comprehensive outline of all outstanding proceedings. These filings are incorporated herein by reference. (Docs. 122 & 123).

Having now reviewed those materials as well, the Court is convinced that it must, as is its duty, on its own motion, abstain from deciding any of the pending motions before it pursuant to the *Burford* abstention doctrine and must stay these proceedings in their entirety. *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). As stated in Wright & Miller:

> Burford-type abstention ... is premised on a belief that in particular areas of the law any intervention by the federal court would have an impermissibly disruptive effect on state policies. The hands-off attitude that Burford reflects means that if the federal court decides that this kind of abstention is indicated—[ ]it may do so on its own motion regardless of the wishes of the parties....

17A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4245 at 101 (2d ed.1988); *United Home Rentals, Inc. v. Texas Real Estate Commission*, 716 F.2d 324 (5th Cir. 1983).

**2.** As Norbert Simmons case constitutes a companion suit to the Metro suit, the Court will focus on Metro's complaint.

**3.** Prior to December 18, 1996, the chain of ownership of those Bally entities involved in the plaintiffs' allegations were: Bally Enter-

## Background

Metro[2] is a Louisiana corporation domiciled in the Parish of Orleans, State of Louisiana. Initially, Norbert Simmons ("Simmons") and Vernon Shorty ("Shorty") were the sole shareholders of Metro. From June, 1992 through and until August 1993, Metro possessed a Certificate of Preliminary Approval from Louisiana for entitlement to a riverboat casino license and an approved riverboat casino berth. As such, Metro's assets were desirable to entities seeking to establish a riverboat casino. Arthur Goldberg of Bally's Casino Holdings, Inc. ("BCH")[3] allegedly pursued Metro for such a purpose.

## Establishment of Belle and Management Contracts

On June 3, 1993, Metro and Bally's Louisiana, Inc. ("BLI") formed Belle of Orleans, L.L.C. ("Belle"), to own and develop a riverboat gaming facility in Orleans Parish. Initially, Metro owned 55% and BLI owned 45%. Metro and BLI entered into an Operating Agreement on August 18, 1993 which concerned the operation and management of Belle. To govern the actual operation and management of the Casino, Belle and BLI also executed on August 18, 1993, a Management Agreement with BCH, under which BCH was to manage the Casino,.

Belle was granted a final riverboat gaming license from the Riverboat Gaming Enforcement Division of the State Police in February, 1994 and a certificate of final approval from the Louisiana Riverboat Gaming Commission, to operate a riverboat casino at South Shore Harbor in Orleans Parish.

tainment Corp. ("BEC") which wholly owned Bally's Casino Holdings, Inc. ("BCH") which wholly owned Bally's Intermediate Casino Holding, Inc. ("BICH") which wholly owned Bally's Louisiana, Inc.("BLI").

Because of questions raised about Shorty's suitability for ownership, Simmons purchased Shorty's stock in Metro in June of 1994, borrowing $4 million to do so from Bally's Intermediate Casino Holdings, Inc ("BICH") pursuant to a loan guaranteed by Metro. In consideration for this loan, Simmons made and executed a promissory note payable to the order of BICH in the principal sum of $4,000,000. Additionally, through a subsequent transaction, Metro's interest was reduced to 50.1% and BLI's ownership increased to 49.9%.

The Management Agreement was subsequently amended on June 22, 1994, to provide for the payment of additional management fees to BICH which payments were slated to reduce the **principal** on the $4,000,000.00 note. Under the terms of the Promissory Note, interest on the Note accrues at a rate equal to 6.74% per annum and that interest is payable quarterly on the first day of March, June, September and December. Should Simmons fail to pay the liabilities when due, interest accrues from the date due until paid at a rate equal to 10.74% per annum. Metro executed a Secured Guaranty of payment

as well. (Complaint in *Bally's Intermediate Holdings, Inc. v. Metro Riverboat Associates, Inc.,* C.A. No. 00–2532 (¶ ¶ 9–15)).

Also in June of 1994, BCH allegedly assigned the Management Agreement to Bally's Intermediate Casino Holdings, Inc. ("BICH"). In January of 1995, BICH then allegedly secretly assigned the Management Agreement to BLI. In doing so, Metro complains of the defendants' failure to obtain Metro's consent, individually or on behalf of Belle, and contends that indeed it concealed the assignment from Metro and Belle. Doing business as "Bally's Casino Lakeshore Resort," Belle opened its doors on July 7, 1995.

In June of 1998, Hilton [4] announced that it planned a "spin-off" and merger whereby it would transfer its gaming assets to a newly formed company, Park Place Entertainment Corporation, which, simultaneously, would merge with Grand Casino, Inc. This transfer of gaming assets included the transfer of Hilton's indirect 49.9% in Belle. (Complaint ¶ 18).[5] Apparently, Metro opposed such a transfer and took actions to stop it. It requested public

**4.** This Complaint is silent with regard to the transfer of Bally's interest in Belle to Hilton which was a precursor of the Park Place/Bally's Midwest transfer. That transfer was proposed in late 1996. The Court is somewhat perplexed that plaintiffs failed to inform the Court that they previously filed a suit in the Eastern District of Louisiana seeking to enjoin the proposed merger of Bally and Hilton Hotels Corp Corporation ("Hilton") until and unless the transaction was approved by the Louisiana Gaming Control Board ("Board"). *Metro Riverboat Assoc., Inc. v. Bally's Entertainment Corp.,* 1996 WL 696875 at ·*1 (E.D.La. Nov. 25, 1996) C.A. No. 96–3812 "C". This failure constitutes a violation of L.R. 3.1 which requires counsel to inform the Court when a newly filed matter comprises a material part of the subject matter of previously filed suit. Furthermore, the "dismissal" that was filed in that case was not in compliance with Fed.R.Civ.P. 41(a). A substantive motion had been filed; as such, that

suit could only properly be dismissed by order of the Court; therefore, that case is technically still pending.

**5.** The Court would note that Metro has characterized the 1998 transfer as if it were caught completely unaware. The Court questions such a description in light of the fact that Metro fought the Hilton/Bally transfer apparently from the start as previously noted. In addition, another suit was filed in Civil District Court in 1997 as to the effect of the alleged transfer on the terms of the Operating Agreement. *See Metro Riverboat Assoc., Inc. v. Bally's Louisiana, Inc.,* (La.App. 4th Cir.1/14/98), 706 So.2d 553. *See also Metro Riverboat Assoc., Inc. v. Bally's Louisiana, Inc.,* 777 So.2d 578 (La.App. 4th Cir.12/13/00) which upheld a preliminary injunction with regard to the effect of the transfer on the Operating Agreement.

records from the Louisiana Gaming Control Board ("LGCB"), the State Police Gaming Enforcement Division ("State Police" or "Division")and the Louisiana Department of Justice Gaming Division ("Attorney General's Office"). The response was inadequate in Metro's opinion.

On November 13, 1998, Metro filed a Petition with the LGCB Hearing Office contesting Hilton's proposed transfer to Park Place which allegedly was refused to be docketed or heard by the LGCB Hearing Office at the behest of LGCB Chairman Hillary Crain ("Crain"). On November 18, 1998, Hilton filed with the LGCB a petition for Approval of Transfer to Park Place. An opposition to the petition was filed by Metro. On December 22, 1998, the hearing was scheduled to occur on December 29, 1998. Alleging that *ex parte* communications with Crain had occurred, Metro filed a Motion to Recuse Crain which motion was denied even though Crain allegedly admitted that he and representatives of the Attorney General's Office and State Police Gaming Division engaged in private meetings with Hilton and Bally representatives. Apparently at the December 29, 1998, LGCB hearing, it was learned that Park Place and its officers and directors had not filed sworn applications or undergone suitability investigation that plaintiffs contend were required by law to be filed.

On December 29, 1998, the LGCB approved by "Resolution" the proposed transfer (the "Transfer") of Hilton's interest in Belle to Park Place, subject to conditions which included Park Place filing an application within 30 days and receiving a final determination of suitability. (Complaint ¶ 29). A new subsidiary of Park Place was allegedly formed, that being Bally's Midwest Casino, Inc. Bally's Midwest was to acquire all of the shares of BLI so that Bally's Midwest would actual-ly hold the ownership interest. Plaintiffs again opine that the failure to mention Bally's Midwest in the Resolution contravened the requirement for approval by the State of an entity's suitability to own a gambling establishment.

**Civil Court Battles as Described in the Amended Complaint**

Metro, unhappy with the transfer, obtained a Temporary Restraining Order prohibiting the transfer of an interest in Belle to Park Place. BLI and Hilton apparently filed a writ application for the dissolution of the TRO to the Fourth Circuit Court of Appeal for the State of Louisiana. Metro opposed the application and again sought recusal of the writ panel asking for *en banc* hearing claiming that Judge Stephen Plotkin had a conflict of interest. All relief sought by Metro was denied; the TRO was dissolved and Hilton made the transfers to Park Place and to Bally's Midwest on December 31 1998 (the "Transfer"). (Complaint ¶ 31).

Metro contends that it then attempted to enjoin the Transfer from becoming complete, on the grounds that the transfer of the interest in Belle was illegal and improper and a breach of the Operating Agreement between Metro and BLI. Apparently in a 1999 affidavit, BLI "falsely represented to the court that the Transfer was complete and, regardless of whether the conditions of the LGCB Resolution were satisfied or not, Bally's Midwest would remain the sole shareholder of BLI and Park Place would remain the ultimate owner of BLI and BLI's interest in Belle." (Complaint ¶ 32).

In paragraph 36 of the Complaint, apparently based on its inability to enjoin the Transfer through yet another unidentified legal proceeding, Metro alleges that:

> [a]s a result of the December 31, 1998 transfer of Hilton's gaming assets, Park Place and Bally's Midwest claim to own

and control substantial interest in Belle and claim to have management authority, even though neither entity had applied for licensure in Louisiana, had requested approval as transferee, had filed suitability applications, had undergone investigation, or received a final determination of suitability prior to their acquisition of those interests. This illegal ownership and control of an interest in a Louisiana gaming operation has continued for eight months. (Complaint ¶ 36).

Nonetheless, Metro opines that because these two new entities, Park Place and Bally's Midwest, claim to own the minority interest in Belle, not having gone through the proper procedures—failing to obtain prior approval and suitability determination—they are "forbidden" to hold an interest or exercise control over the Belle and a transfer made without them is null and void. (Complaint, ¶ 38).

Based on these actions, Metro then alleges that defendants BLI, Goldberg, Barr, Hilton BCH, BICH, and Bally's Midwest "have conspired with LGCB Chairman Crain, LGCB's counsel and a host of other Louisiana state officials" to "prevent the enforcement and to obstruct the enforcement of state gaming law and regulation against BLI, Goldberg, Barr, BICH, BCH,. Hilton, Bally's Midwest or Park Place." (Complaint, ¶ 39).

These allegations fail to mention that there is on-going state court litigation with respect to these management rights. The Court of Appeal of Louisiana for the Fourth Circuit, recently reiterated with respect to the issue of "whether the assignments relating to the Management Agreement violated any gaming regulations as alleged by Metro," that such purely regulatory issues are within the **exclusive jurisdiction** of the Louisiana Gaming Control Board pursuant to La. R.S. 27:

15B(1). *Metro Riverboat Assoc., Inc. v. Bally's Louisiana Inc.,* 779 So.2d 122 (La. App. 4th Cir.2/16/01).

Furthermore, the Fourth Circuit Court of Appeal for the State of Louisiana has found that it has jurisdiction to consider whether the subject Operating Agreement has been breached under state law—that is whether there has been a "change of control" and whether Bally's has breached a non-compete clause in the Operating Agreement such that Metro may now act unilaterally as majority owner, regardless of which Bally entity "owns" the 49.9% of Belle. It appears to the Court from the opinions rendered in those state court proceedings that there is a preliminary injunction in place providing that Metro now controls the Belle checking account including disbursements as the controlling member of Belle Company. *Metro Riverboat Associates, Inc. v. Bally's Louisiana, Inc.,* 777 So.2d 578 (La.App. 4th Cir.12/13/00). However, BLI filed a writ application with the Supreme Court on March 2, 2001. *Metro Riverboat Associates, Inc. v. Bally's Louisiana, Inc.,* Louisiana Supreme Court, No. 01–C–580. Thus, the issue of the legal effect of the merger as to the Operating Agreement is the subject of on-going litigation in the Louisiana courts.

**Administrative Battles**

Metro also filed an administrative appeal to the 19th Judicial District Court for the Parish of East Baton Rouge regarding the Resolution of December 29, 1998 (the Resolution which permitted the "Transfer") which was heard by Judge Robert Downing. Downing apparently held that "gaming law and regulation did not allow the LGCB to approve the Transfer of a casino business prior to the filing of an application by the proposed transferee, the conducting of suitability investigations, and the issuance of a final determination of suitability by Louisiana state regulators."

(Complaint ¶ 41). On January 27, 1999, **Judge Downing vacated the LGCB's December 29, 1998 Resolution and declared it to be of *no force and effect*.** A suspensive appeal was taken by the Attorney General on behalf of the LGCB.

Since the Amended Complaint was filed, opinions have been rendered by the Court of Appeal for the First Circuit in *Metro Riverboat Associates, Inc. v. Louisiana Gaming Board* (La.App. 1st Cir.2000), 761 So.2d 694 concerning this issue. Initially, the First Circuit apparently held that a gaming licensee cannot be transferred without application, investigation, and finding of transferee's suitability to hold such interest. Thus, the First Circuit vacated the actions about which Metro complains in this portion of its Complaint. On rehearing, the appellate court clarified its ruling and specifically **remanded the matter requiring the Louisiana Gaming Control Board to conduct a public hearing concerning the approval of the Transfer *after the transferee has filed its application and been investigated by the Louisiana State Police*.** *Metro Riverboat Associates, Inc. v. Louisiana Gaming Board* 99 CA 863 (La.App. 1st Cir.12/20/00), 774 So.2d 1193, 1205. The Gaming Board filed a writ application with the Supreme Court on January 19, 2001, No. 01–C–185 seeking a determination of under what circumstances must the Gaming Board convene adjudicatory hearings at the instance of parties who object to regulatory actions, and whether an adjudicatory hearing is required for the Hilton/Park Place merger and spin off.

Metro, in its Amended Complaint, also opines that the State Police Enforcement Division ordered Belle, Metro and BLI to submit a renewal application for the Belle's license. Metro contends that BLI obstructed the process and provided incorrect information to Metro such that it caused the filing of a gaming application which omitted information pertaining to ownership and control of BLI and would be criminal offense. (Complaint ¶ ¶ 43–45). Thus, Metro contends that BLI is owned and controlled by entities which have not been found suitable to hold an interest in or exercise control over a gaming business in this state. (Complaint ¶ 46).

This controversy, however, is also the subject of on-going litigation. "In Re: Belle of Orleans, L.L.C., d/b/a Bally's Casino" Louisiana Gaming Control Board Hearing Officer, Incident No. RHS980639, SAR No. 98–1–04–217–2119. Apparently, after an evidentiary hearing the Gaming Board Hearing Officer dismissed the Notice of Violation, "inasmuch [as] no statutes and/or regulations were violated in the assignment of the Management Agreement. . . ." Appeals were filed by the State Police and purportedly by the Belle L.L.C. through Metro. After a hearing from those appeals, the Gaming Board remanded the matter to the Hearing Officer for a second evidentiary hearing, with instructions to the Hearing Officer to allow BLI and Metro to participate and present evidence. However, after Metro's motion to recuse the Hearing Officer was denied, Metro administratively appealed the recusal decisions, which is pending. As a result, the second evidentiary hearing, last scheduled for May 23, 2000, has not yet been re-scheduled.

Another focus of plaintiffs' allegations concerns the control of the funds generated by Belle and how that money is collected, distributed and allocated. As certain management fees were slated to reduce the principal amount of the Promissory Note, plaintiffs contend that control of those funds impacts on the accounting of what amount is due and owing on that note. Furthermore, plaintiffs contend that

Louisiana Riverboat Gaming Regulation LAC.42XIII:2527 prohibits any money or thing of value from being "paid, remitted or distributed, directly or indirectly to a transferee (i.e. BLI or its distributee) until *both* the transfer and the transferee have received final approval." As such, there is an on-going battle with respect to whether escrowing of the funds generated is appropriate and whether hearings conducted were done in accordance with Louisiana law. Plaintiffs allege that the actions taken in these hearings constitute predicate acts that support their RICO claims.

However, again, there is on-going state court litigation that impacts directly on these issues. A writ application filed by the Gaming Board is presently pending. *Bally's Louisiana, Inc. v. Louisiana Gaming Control Board,* Louisiana Supreme Court, No. 01–C–510. In this suit, BLI sought to enjoin the Gaming Board from escrowing its management fee. Metro intervened. The court permanently enjoined enforcement of and vacated the Gaming Board's escrow orders. Metro appealed (1st Cir. No. 99–CA2617). On January 31, 2001, the court of appeal reversed the preliminary and permanent injunctions; severed and remanded the injunction proceeding to the trial court for random re-allotment and further proceedings; reversed the dismissal of BLI's petition for judicial review; and remanded to the trial court for further proceedings.

The basis for the reversal was that the Gaming Board's escrow orders violated BLI's constitutionally-protected due process and property rights. The Gaming Board acquiesced in this finding, but the Board filed a writ application with the Supreme Court on February 21, 2001 (No. 01–C–510), raising the same procedural issue that it raised in the writ application discussed at p. 771 above (No. 01–C–185).

Plaintiffs allegations and the on-going state litigation concerning the administration and regulation of the Gaming industry in Louisiana directly implicate the *Burford* abstention doctrine which the Court will now discuss in detail.

## Burford Abstention Doctrine

The Court is aware that it has a strict duty to exercise the jurisdiction that is conferred upon it by Congress. *Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996), *citing Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 821, 96 S.Ct. 1236, 1248, 47 L.Ed.2d 483 (1976). As stated in *New Orleans Public Serv., Inc. v. Council of the City of New Orleans,* 491 U.S. 350, 358–59, 109 S.Ct. 2506, 2513, 105 L.Ed.2d 298 (1989):

> For example:"We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the Constitution." *Cohens v. Virginia,* 6 Wheat. 264, 404, 5 L.Ed. 257 (1821). " '[T]he courts of the United States are bound to proceed to judgment and to afford redress to suitors before them in every case to which their jurisdiction extends. They cannot abdicate their authority or duty in any case in favor of another jurisdiction.' " *Chicot County v. Sherwood,* 148 U.S. 529, 534, 13 S.Ct. 695, 697, 37 L.Ed. 546 (1893) (citations omitted). "When a Federal court is properly appealed to in a case over which it has by law jurisdiction, it is its duty to take such jurisdiction.... The right of a party plaintiff to choose a Federal court where there is a choice cannot be properly denied." *Willcox v. Consolidated Gas. Co.,* 212 U.S. 19, 40, 29 S.Ct. 192, 195, 53 L.Ed. 382 (1909) (citations omitted).

*Id.* Thus, " '[a]bstention from the exercise of federal jurisdiction is the exception, not

the rule.'" *Wilson v. Valley Electric Membership Corp.*, 8 F.3d 311 (5th Cir. 1993) *citing Colorado River*, 424 U.S. at 813, 96 S.Ct. at 1244. However, a number of abstention doctrines have been enunciated by the Supreme Court, and that recognized in *Burford v. Sun Oil Co.* is applicable in this case.

In *Burford*, Sun Oil Co. challenged a drilling permit issued to Burford by the Texas Railroad Commission. Sun Oil contended that the order violated state law and the federal Due Process Clause. The Supreme Court held that the district court should have abstained based on "the comprehensive nature of the state regulatory scheme, the large interest of the state in regulating and conserving its oil and gas resources, and the need for a unified approach to granting permits by a single adjudicatory body." *Sierra Club v. City of San Antonio*, 112 F.3d 789, 793 (5th Cir. 1997) *citing Burford*, at 327–34, 63 S.Ct. at 1104–08. The United States Court of Appeals for the Fifth Circuit has described the reasoning behind the *Burford* abstention as follows:

> *Burford* abstention does not so much turn on whether the plaintiff's cause of action is alleged under federal or state law, as it does on whether the plaintiff's claim may be "in any way entangled in a skein of state law that must be untangled before the federal case can proceed."

*Id.* at 795 *citing Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 726–27, 116 S.Ct. 1712, 1726, 135 L.Ed.2d 1 (1996).

■ The Supreme Court distilled the principle of the *Burford* doctrine.

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceeding or orders of state administrative agencies: (1) when there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar"; or (2) where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."

*New Orleans Public Service, Inc.*, at 362, 109 S.Ct. at 2515. In *Quackenbush*, the Supreme Court made clear that the force of *Burford's* principles were equally applicable where damages are sought; however, in that instance, the proper course of action is apparently to stay the matter. *Quackenbush*, at 720–21, 116 S.Ct. at 1723.[6]

■ The Supreme Court has further noted that there is no "formulaic" approach as to the application of the *Burford* doctrine in *Quackenbush*. Nonetheless, five factors have been previously identified to consider in making this determination and still provide some guidance to the Court in rendering this decision. They are:

(1) whether the cause of action arises under state or federal law;

6. The Court wrote:
   We have thus held that in cases where the relief being sought is equitable in nature or otherwise discretionary, federal courts not only have the power to stay the action based on abstention principles, but can also, in otherwise appropriate circumstances, decline to exercise jurisdiction altogether by either dismissing the suit or remanding it to state court. By contrast, while we have held that federal courts may stay actions for damages based on abstention principles, we have not held that those principles support the outright dismissal or remand of damages actions.
   *Id.*

(2) whether the case requires inquiry into unsettled issues of state law or into local facts;

(3) the importance of the state interest involved;

(4) the state's need for a coherent policy in the area; and

(5) the presence of a special state forum for judicial review.

*Wilson,* 8 F.3d at 314; *Albin v. Dent,* 1996 WL 187436 (E.D.La. April 16, 1996).

As previously noted, the gravamen of this suit centers on the legality of the transfer of ownership of a gambling enterprise, the legality of the assignment of management rights of that gambling establishment, the effect of these transfers on the terms of an Operating Agreement, and ultimately, the control of the revenues generated by the gambling establishment. Louisiana has created a comprehensive administrative and regulatory scheme embodied in the Louisiana Gaming Control Law ("LGCL") found at La.Rev.Stat. 27:3 *et seq.* by which the Louisiana legislature has created an administrative agency to regulate and enforce its intent and policies.

**The Louisiana Gaming Control Law**

■ The Louisiana legislature found it to be the public policy of the state that the development of a controlled gaming industry to promote economic development of the state required "thorough and careful exercise of legislative power" to protect the general welfare of the state. As such, it declared that all persons, locations, practices, associations and activities related to the operation of licensed and qualified gaming establishments "shall be strictly regulated." La.Rev.Stat. 27:2(A). As such the legislature declared its express intent and policy:

> that no gaming operator nor any applicant for a license, permit, or other thing existing, issued, or let as a result of this Title, shall have any right of action obtain any license, casino operating contract, permit or the granting of the approval or affirmative board action sought **except as provided for and authorized by this Title**.

La.Rev.Stat. 27:2(B). For that task, the Louisiana Gaming Control Board was established, and eligibility for membership, terms and requirements for meetings was defined. La.Rev.Stat. 27:11(A). At section 15 of the LGCL, the Board is authorized to "regulate all gaming activities and operation in the state as more specifically provided in this Title." La.Rev.Stat. 27:15(A). Specifically, the statute states:

B. The board shall:

(1) Have all regulatory authority, control, and jurisdiction, including investigation, licensing, and enforcement, and all power incidental or necessary to such regulatory authority, control, and jurisdiction over all aspects of gaming activities and operations as authorized pursuant to the provisions of the Louisiana Riverboat Economic Development and Gaming Control Act, the Louisiana Economic Development and Gaming Corporation Act, and the Video Draw Poker Devices Control Law, except as otherwise specified in this Title....

(8) Adopt such policies and rules as are necessary to the efficient, efficacious, and thorough conduct of the business of regulating and controlling the gaming operations and activities under its jurisdiction and as required by this Title. Rules shall be adopted pursuant to the Administrative Procedure Act, and notwithstanding any other provision of law to the contrary, rules of the board shall be subject to legislative oversight and review....

La.Rev.Stat. 27:15(B)(1) and (8).

In conjunction with these powers, the Louisiana Gaming Control Board Hearing

Office was created as a division of the board. It is empowered to hear any matter which is disputed or contested through a hearing officer at a public hearing conducted in accordance with the adjudication provisions of the Administrative Procedure Act. La.Rev.Stat. 79:950 *et seq.* All appeals for any decision of the board must be filed in the Nineteenth Judicial District Court and shall be reviewed solely on the record. La.Rev.Stat. 27:27.

Certainly, these laws, in conjunction with the rules promulgated, demonstrate a distinct and avid interest on the part of the State of Louisiana in regulating its gaming industry. As such, the Court will now demonstrate why the *Burford* doctrine applies in this instance requiring the Court to stay the adjudication of these suits.

**The Burford Doctrine Squarely Dictates the Court to Abstain**

While the courts have articulated the *Burford* abstention doctrine in a number of ways as noted above, certain recurrent factors demand the application of the doctrine. The doctrine has been applied where a comprehensive administrative scheme exists and there are on-going proceedings within that framework. *Sierra Club v. City of San Antonio,* 112 F.3d at 793. As demonstrated above, issues pertaining to the interpretation of the Louisiana Gaming Control Law and regulations and actions taken by the Louisiana Gaming Control Board are the subject of ongoing litigation. These same issues—(1) whether the transfer of ownership in the Belle was proper; (2) what the effect does that transfer have on the Operating and Management Agreements; (3) whether money generated by the Belle must be escrowed or can be distributed; and (4) whether the Belle license should be suspended or revoked—obviously are implicated. These issues are at the very core of the plaintiffs' claims against the defendants. These thorny questions are inextricably "entangled in a skein of state law that must be untangled before the federal case can proceed." *Sierra Club,* 112 F.3d at 795. As such, abstention is squarely implicated.

To abstain based on the *Burford* doctrine is also indicated where there are important issues of public policy. Certainly, the very language of Louisiana Gaming Control Laws establish the importance the state legislature places on the regulation of this industry. Where there is (1) a comprehensive state regulatory scheme, (2) a large interest of the state in regulating a particular resource or area of the law (e.g. the insurance industry or family law) [7], and (3) a need for a unified approach to granting permits by a single adjudicatory body, courts have been instructed to abstain. *Burford,* at 327–34, 63 S.Ct. at 1104–08. Certainly, public policy questions are implicated by the salient issues raised by plaintiffs, and the state has indicated that it has a paramount interest in resolving these questions.

Finally, should this Court attempt to adjudicate the RICO claims brought before it as well as the claims based on the Promissory Note, such action would disrupt the regulatory scheme. The Court is convinced that it would be a grave mistake for it to take up this suit at this juncture. Indeed, the *Burford* doctrine has been employed in the context of a RICO suit where the application of state laws are clearly implicated. *DuBroff v. DuBroff,* 833 F.2d 557 (5th Cir.1987); *Albin v. Dent,* 1996 WL 187436 (E.D.La. April 16, 1996).

7. *Albin v. Dent,* 1996 WL 187436 (E.D.La. April 16, 1996);*see also DuBroff v. DuBroff,* 833 F.2d 557 (5th Cir.1987) (federal court abstain in suit presenting novel and dubious question of state family law).

Accordingly,

**IT IS ORDERED** that this Court shall abstain from the adjudication of these consolidated matters.

**IT IS FURTHER ORDERED** that all three cases should be **STAYED** and **STATISTICALLY CLOSED** for all purposes until the following litigation has reached a final resolution:

1. *Metro Riverboat Associates, Inc. v. Bally's Louisiana Inc.*, Louisiana Supreme Court, No. 01–C–580;

2. *Metro Riverboat Associates, Inc. v. Bally's Louisiana, Inc.*, Louisiana Fourth Circuit Court of Appeal, No. 99–CA–0983;

3. *Metro Riverboat Associate, Inc. v. The Louisiana Gaming Control Board*, Louisiana Supreme Court, No. 01–C–185;

4. *Metro Riverboat Associates, Inc. v. The Louisiana Gaming Control Board*, Louisiana First Circuit Court of Appeal, No. 99–CA–2322;

5. *Metro Riverboat Associate, Inc. v. The Louisiana Gaming Control Board*, Louisiana Supreme Court, No. 01–C–0818;

6. *Metro Riverboat Associates, Inc. v. The Louisiana Gaming Control Board*, Nineteenth Judicial District Court for the Parish of East Baton Rouge, No. 459–808;

7. *Metro Riverboat Associates, Inc. v. Bally's Louisiana, Inc.*, Louisiana Fourth Circuit Court of Appeal, No.2000–CA–1147;

8. *Bally's Louisiana, Inc. v. The Louisiana Gaming Control Board*, Louisiana Supreme Court, No. 01–C–510;

9. *Norbert A. Simmons, et al. v. Bally's Louisiana, et al.*, Nineteenth Judicial District Court for the Par-

ish of East Baton Rouge, No. 469–076;

10. *In Re: Belle of Orleans, L.L.C. d/b/a Bally's Casino*, Louisiana Gaming Control Board Hearing Officer, Incident no. RGS980639, SAR No. 98–1–04–217–2119.

**IT IS FURTHER ORDERED** that the Motions to Dismiss are **DENIED** without prejudice, and may be re-filed with all briefing taking into consideration the resolution of the above-noted proceedings.